1998-NMSC-037

969 P.2d 313

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Matt BROWN, Defendant–Appellant.**

State of New Mexico, Plaintiff–Appellee,

v.

Tyrone Smith, Defendant–Appellant.

Nos. 23674, 23748.

Supreme Court of New Mexico.

Sept. 16, 1998.

Rehearing Denied Nov. 5, 1998.

Lamberton & Riedel, Hilary Lamberton, Santa Fe, for Appellant in No. 23674.

Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., John D. Cline, Albuquerque, for Appellant in No. 23748.

Tom Udall, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

MINZNER, J.

{1} A jury convicted co-defendants Tyrone Smith and Matt Brown of first degree murder in violation of NMSA 1978, § 30–2–1(A)(1) (1994), conspiracy to commit first degree murder in violation of NMSA 1978, § 30–28–2(B)(1) (1979), and tampering with evidence in violation of NMSA 1978, § 30–22–5 (1963). They appeal these convictions to this Court claiming the trial court erred in several critical areas.

{2} Defendants argue that the trial court erred in its refusal to instruct the jury on the lesser included offense of voluntary manslaughter; that this cause should be remanded for a hearing pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); that the trial court erred when it admitted the testimony of three witnesses as evidence of prior consistent statements; that the trial court erred in admitting the testimony of the two main prosecution witnesses, because the immunity agreement with one witness was impermissibly coercive and the trial court lacked authority to immunize the other witness; that the court erred in the admission of stipulated testimony; that the jury should have been cautioned regarding accomplice testimony; and that the testimony of witnesses regarding their fear of Defendants was inadmissible hearsay. Because these arguments overlap, we consolidate the two appeals.

{3} We conclude the trial court did not commit reversible error in admitting any testimony purported to be hearsay and that the trial court properly admitted the testimony of the two main prosecution witnesses. We also conclude that the trial court did not err in permitting various witnesses to testify regarding their fear of Defendants. We address these and other issues in greater detail in the following opinion. For the reasons stated below, we affirm.

## I. FACTS

{4} On September 14, 1992, the body of Jerol Younger, an Air Force sergeant stationed at Kirtland Air Force base, was found in an irrigation ditch in south Albuquerque. He had been strangled and beaten to death. Younger allegedly was a drug dealer in Albuquerque up until the time of his death.

{5} Denise Spikes and Frank Lucero were the two main prosecution witnesses. The stories they told provided the theory of the State's case. Spikes testified as follows.

{6} She and Younger had been married at one time and had a son together. Spikes testified that Younger disliked the intimate relationship that had developed between Spikes and Defendant Smith. According to Spikes, Defendant Smith and Spikes decided to resolve the relationship with Younger by going to talk to him. Spikes called Younger from a pay phone in Albuquerque and asked him to come and get her. The two drove to Lucero's house, a small, free-standing room in Albuquerque's South Valley, where Defendants and Lucero were waiting. When Spikes knocked on the door, Younger was grabbed and taken into the house, and Spikes remained outside. She testified she heard Younger scream and she ran to a nearby pay phone. Defendant Smith, however, came to get her, apparently before she was able to phone for help. When she arrived back at Lucero's house, Younger was gone, as was his car. Defendant Smith went into the house for a few minutes, came out, and he and Spikes went to his mother's home. Several weeks later, Spikes asked Defendant Smith if he had killed Younger and he denied it.

{7} Lucero, who was in the room at the time of the killing, testified as follows. He said that he was at his girlfriend's house when Defendant Smith came to the door and said that he needed to go to Lucero's house because someone was going to pick up a television. Lucero testified that he got into a

Blazer belonging to Defendant Smith's mother, in which Spikes and Defendants were seated. They drove to Lucero's house and entered. Lucero testified that Defendant Smith and Spikes left, and Defendant Smith returned alone with a television, which he placed in the closet. Lucero stated that he heard a car drive up, and heard two voices; he recognized one as the voice of Spikes, and the other as male. The man entered, and Defendant Smith told the man that the television was in the closet. When he went to the closet, Defendants attacked the man with hammers. Lucero testified that Spikes was walking in at the time, but that the door must have closed on her. Lucero testified that Defendant Brown retrieved a gun from a bag and held it on the man while Defendant Smith tied him. Defendant Smith then told Lucero to put on gloves, take the man's car keys, and get rid of the car. Lucero did so. Afterwards, Defendant Smith found Lucero and brought him back to his house. The man was still on the floor at Lucero's home. The three men loaded the body into a truck and dumped his body in a ditch.

{8} Following the murder, Lucero became very anxious around police officers. According to Lucero's cousin, Denise Purcell–Abeyta, and her roommate, Matilda Gonzales, Lucero admitted to killing Younger because he owed Younger money for drugs. Shortly after this, police attempted to search Lucero's home, but it had been burned down. In the remains of the house, however, the police found a hammer head and handle, plastic bags, duct tape, and cords similar to those used to tie up Younger. Around the time of the search, both Lucero and Defendant Smith left the state and traveled to San Diego to visit Spikes.

{9} In San Diego, Lucero stayed with his aunt, Linda Satomba. When police located Satomba, she initially denied knowing his whereabouts. Later, though, she told police Lucero had related to her a story similar to his trial testimony. According to Satomba, Lucero never admitted to killing Younger. Satomba testified at trial regarding Lucero's statements. Her testimony was admitted under the prior consistent statement rule.

{10} Lucero was given transactional immunity and Spikes was given use immunity to testify at trial. Defendants were convicted of first degree deliberate intent murder, conspiracy to commit first degree murder, and two counts of evidence tampering. They were sentenced to life imprisonment plus twelve years.

{11} Defendants argue that the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter and that the State should have been forced to produce evidence of allegedly related crimes. Defendants additionally argue that the trial court erred in admitting Lucero's and Spikes' testimony. They contend that Lucero's out-of-court statements to Satomba, and Spikes' out-of-court statements to Constance O'Grady and Theresa Jimenes were inadmissible hearsay. They also contend that the court should have given the jury a cautionary instruction regarding the testimony of immunized accomplices; that Lucero's immunity agreement violated Defendants' due process rights because it was impermissibly coercive; and that the court did not have the authority to immunize Spikes. We discuss each of these contentions in turn.

## II. *VOLUNTARY MANSLAUGHTER INSTRUCTION*

{12} Defendants claim that they were entitled to have the jury instructed on voluntary manslaughter. In order to obtain an instruction on a lesser included offense, "[t]here must be some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view must be reasonable." *State v. Curley,* 1997–NMCA–038, ¶ 5, 123 N.M. 295, 939 P.2d 1103.

{13} In this case, there must be some view of the evidence that Defendants killed after being sufficiently provoked. UJI 14–220 NMRA 1998. Defendants argue that Spikes' and Jimenes' testimony that Spikes had been abused by Younger during their relationship, and Spikes' testimony that Younger was jealous of her relationship with Smith raise an inference that Defendants acted in response to sufficient provocation.

Spikes testified that Defendant Smith physically abused her on two occasions shortly before the murder, and she informed Younger of this abuse after he noticed marks on her neck while driving to Lucero's house on the day of the murder. Defendants allege that Spikes' testimony that Younger was upset by the marks on her neck and angry for this reason at Defendant Smith also support an inference of provocation. The evidence does not support such an inference. *See* UJI 14–222 NMRA 1998 (defining provocation, in part, as "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other *extreme emotions*" affecting defendant's "ability to reason" and causing a "loss of self control.") (emphasis added). At most, the testimony on which Defendants rely demonstrates their awareness of Younger's potential for violence; however, the evidence regarding the way in which the attack took place shows absolutely no provocation. Lucero testified that Younger was grabbed and beaten after going to a closet to get a television set. Spikes testified that she saw Younger yanked into Lucero's room. No evidence was adduced at trial to support an inference of sufficient provocation. Defendants were not entitled to an instruction on voluntary manslaughter.

## III.  PRODUCTION OF EVIDENCE

{14} Defendant Smith claims that the prosecution withheld potentially exculpatory evidence, which should have been disclosed under *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Our rule requires that the state disclose any evidence "favorable to the defendant which the state is required to produce under the due process clause of the United States Constitution." Rule 5–501(A)(6) NMRA 1998. Defendant Smith sought police investigation records about the deaths of two women, one of whom was found gagged and bound as was Younger. Because these deaths apparently occurred within days of Younger's murder, Smith sought to show that the murders might be linked.

{15} "A defendant's motion for production must be based upon facts, not conclusions, or mere surmise and conjecture, and a

blanket request will not be granted, because the defendant has no right to examine the state's evidence merely in the hope that something will turn up to aid him." *State v. Tackett,* 78 N.M. 450, 453–54, 432 P.2d 415, 418–19 (1967) (citations omitted). Defendant Smith heard of the deaths, which he surmised might be linked, through the newspapers. He had no other basis for requesting the police files on these other cases. We hold that this is not enough to establish a due process violation. "[O]nly if there is a reasonable *probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" should a court remand for a *Brady* hearing. *People v. Memro,* 11 Cal.4th 786, 47 Cal. Rptr.2d 219, 905 P.2d 1305, 1330 (1995) (en banc) (citations and quotation marks omitted) (emphasis added), *cert. denied,* —— U.S. ——, 117 S.Ct. 106, 136 L.Ed.2d 60 (1996). There may have been a facial resemblance between the way the body of Younger and that of the other victim had been found, but that resemblance is not enough to show that it was probable that the result of the trial would have been different had the evidence been disclosed.

## IV.  ACCOMPLICE–RELATED EVIDENCE

{16} Defendants' remaining points of error largely concern the admissibility, credibility and weight of the accomplice testimony of Lucero and Spikes. Although not expressly articulated, we believe these claims essentially center around the question of whether Lucero's and Spikes' testimony constituted sufficient evidence to sustain a conviction. Therefore, we will discuss each of these claims in turn, followed by a general analysis of whether these claims, in combination, rise to the level of a due process violation.

### A.  Issues related to Lucero's testimony
### 1.  Lucero's immunity agreement was not impermissibly coercive.

{17} Defendants concede that they failed to object at trial to the admission of Lucero's testimony on the grounds that the immunity agreement was impermissibly coer-

cive and therefore violated Defendants' due process rights. Because Defendants failed to preserve this question for review, we will reverse on this issue only if the question of guilt is so doubtful that to affirm the conviction would shock the conscience. *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991).

{18} "[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." *People v. Medina*, 41 Cal.App.3d 438, 116 Cal.Rptr. 133, 145 (Ct.App.1974), *quoted in part in State v. Zinn*, 106 N.M. 544, 548, 746 P.2d 650, 654 (1987). "[T]he primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings ...." *People v. Badgett*, 10 Cal.4th 330, 41 Cal.Rptr.2d 635, 895 P.2d 877, 886 (1995) (en banc). "[T]he burden of proving improper coercion is upon the defendant." 10 Cal.4th 330, 41 Cal.Rptr.2d 635, 895 P.2d 877, 887.

{19} In New Mexico, we have said that an immunity agreement must not require the accomplice to return a conviction or testify in a certain fashion. *Zinn*, 106 N.M. at 548, 746 P.2d at 654. "[T]he principal requirement for the validity of an immunity agreement is that the accomplice testify truthfully; likewise, absent an agreement that induces an accomplice to testify in a certain fashion, the testimony of an accomplice goes to credibility, not to admissibility." *Id.* (citation omitted).

{20} The agreement in this case required Lucero to "give complete and truthful statements of all facts known to him regarding the murder of [Jerol Younger] as represented by his attorney and set forth in paragraphs 1 through 11 [of the agreement]." Defendants argue that this required Lucero to testify in conformity with the facts as the State understood them through their investigation and his attorney's representations. While it is possible to interpret this language as Defendants argue—that is, as compelling Lucero to testify to a particular story, whether truthful or not—the record supports a

conclusion that the prosecutor did not intend to compel Lucero to testify other than truthfully and that Lucero understood he was to testify truthfully.

### a.

{21} First, Lucero stated on direct examination that he understood that his agreement was to tell the truth:

Q: Tell us what your understanding of the immunity agreement is.

A: It [sic] I come forth, cooperate, tell the truth to the best of my knowledge, basically cooperate and—basically just tell the truth to the best of my knowledge.

Q: If you tell the truth to the best of your knowledge, is it your understanding that no charges are going to be brought against you?

A: Correct.

This line of questioning indicates that both the State and Lucero understood that his only obligation under the agreement was to be truthful and cooperative. Additionally, counsel for Smith elicited an affirmative response from Lucero on the following question on cross-examination: "Meaning [by transactional immunity] that for the whole incident, you have no exposure, as long as you testify truthfully and do whatever they say, right?" Finally, counsel for Defendant Brown stated in closing arguments that Lucero's "a man given total immunity from prosecution. *All he has to do is tell you the truth.* But what he does is give you two or three versions of what occurred." (Emphasis added.) Under such circumstances, Defendants cannot realistically contend that Lucero was compelled by the State to testify to any particular version of facts. Lucero's prior consistent statement to Satomba, made absent any governmental influence, supports the conclusion that Lucero's testimony was not sufficiently unreliable to deny Defendants a fair trial.

### b.

{22} The California Supreme Court, the opinions of which this Court cited with approval in *Zinn*, has allowed the testimony of accomplice witnesses under similar circum-

stances. In *People v. DeSantis*, 2 Cal.4th 1198, 9 Cal.Rptr.2d 628, 831 P.2d 1210, 1220–21 (1992) (en banc), an accomplice, Masse, testified against the defendant after Masse's own conviction and sentencing in the hope of being resentenced to a lighter sentence. The defendant objected to Masse's testifying prior to any resentencing resulting from his agreement with the State. *Id.* In affirming the district court's decision to allow the testimony, the Court stated,

> Notwithstanding defendant's efforts to portray the agreement as impermissibly tainted because Masse asserted that he expected to have to testify in conformity with his prior statement, the record elsewhere establishes that Masse meant by his assertion that his testimony at trial would have to conform to that given in his tape-recorded statement because both were true. Masse declared repeatedly that his duty under the agreement was to be truthful and give a complete account of the facts, and that if he did so the sentencing court might reduce his sentence. That was also his interviewers' understanding. . . . In sum, though the bargain obviously contained "a . . . degree of compulsion [of the type] inherent in any plea agreement or grant of immunity," [*People v. Morris*, 53 Cal.3d 152, 279 Cal.Rptr. 720, 807 P.2d 949 (1991) ], from Masse's perspective the degree of compulsion was not overwhelming, and more important, the only demand Masse understood the agreement made of him was to tell the truth. Such a bargain did not make the trial fundamentally unfair, and hence did not offend defendant's due process rights.

2 Cal.4th 1198, 9 Cal.Rptr.2d 628, 831 P.2d 1210, 1221.

{23} Similarly, in *Badgett,* the accomplice received a letter from the prosecution giving her immunity "should she testify under oath to these same statements." *Badgett,* 41 Cal. Rptr.2d 635, 895 P.2d at 894 (emphasis omitted). The Court concluded that "these same statements" merely referred to new testimony and not that she remain consistent. 41 Cal.Rptr.2d 635, 895 P.2d at 895. More importantly for this case, however, the Court determined that, even if the statement created such a condition, "the consistency require-

ment did not continue in effect. At the ensuing preliminary hearings, there was no further mention of the consistency requirement when the immunity agreement was discussed." 41 Cal.Rptr.2d 635, 895 P.2d at 896. In fact, in the trial court, the witness "testified repeatedly that her understanding of her immunity agreement was that she would get immunity for the juvenile charges formerly pending against her if she would agree to testify truthfully in court." 41 Cal.Rptr.2d 635, 895 P.2d at 895.

> If the immunity agreement in this case had conditioned [the accomplice's] immunity on an understanding that she would testify at trial consistently with her previous statements to the police, we would conclude that the trial court erred in rejecting the defense motion to exclude her testimony. Our review of the record, however, persuades us that although, as defendants claim, there was some mention of consistency in the initial understanding with respect to immunity at [the accomplice's] juvenile court detention hearing, the agreement under which she actually testified did not contain such a condition. It is the latter agreement, of course, that is determinative of defendants' claim.

41 Cal.Rptr.2d 635, 895 P.2d at 893.

### c.

{24} Lucero understood the agreement to require him only to tell the truth. Defendants did not elicit anything to the contrary on cross-examination. In fact, it appears that Defendants' counsel understood the agreement in a similar manner at trial. Further, Defendants objected to the introduction of the agreement into evidence. Thus, any lack of information the jury may have had to weigh the credibility of Lucero for purposes of coercion resulted from Defendants' actions. We conclude that this testimony was not inherently unreliable, that Lucero's credibility was properly left to the jury, and that the immunity agreement was not coercive. *See, e.g., People v. Deltejo,* 166 A.D.2d 317, 560 N.Y.S.2d 778, 779 (App.Div. 1990). Therefore, the admission of Lucero's testimony does not amount to fundamental error.

## 2. The trial court did not err in refusing to admit Lucero's prior arrests.

{25} Defendant Smith argues that the trial court erred in not allowing him to cross-examine Lucero regarding prior arrests; specifically, Smith argues he should have been allowed to question Lucero about his attempts to exculpate himself from the criminal conduct for which he was arrested. "[T]he standard of review for limitations on cross-examination is abuse of discretion." *State v. Brown,* 1997–NMSC–029, ¶ 18, 123 N.M. 413, 941 P.2d 494, *cert. denied,* —— U.S. ——, 118 S.Ct. 426, 139 L.Ed.2d 327 (1997). We are not persuaded that the trial court abused its discretion here.

{26} Smith asked the trial court to admit evidence of Lucero's two juvenile arrests and one adult arrest, arguing that the arrests and Lucero's response to them were admissible under Rule 11–404(B) NMRA 1998 and Rule 11–405(B) NMRA 1998. Smith further argued that Lucero responded to each of his arrests by blaming others for the criminal act, just as he was doing here, and therefore, he had a pattern of exculpating himself by pointing the blame at others. The trial court disagreed, finding that the prejudicial effect outweighed the probative value.

{27} On appeal, Smith contends that the court prevented him from conducting effective cross-examination. We disagree. Smith cross-examined Lucero on each aspect of his testimony. He questioned Lucero regarding his immunity agreement, his decision to tell his story to police, his choice of attorneys, his relationship with Younger and Defendants, and his decision to leave the state. Defendant Smith's argument that he was unable to test Lucero's credibility has no merit. We do not agree that the additional information regarding his previous arrests, none of which resulted in a conviction, would have substantially altered the cross-examination or the result of the trial.

## 3. The trial court did not err in accepting stipulated testimony.

{28} Defendants claim the trial court erred in admitting two paragraphs of a stipulation to which they objected. Karen Thomas, who was an undercover narcotics investigator for Bernalillo County at the time of Younger's murder, was unavailable at the time of trial due to illness. Therefore, the State and the defense, who sought Thomas' testimony as part of their defense, agreed to a stipulation regarding the content of her testimony. The defense stated, "[W]e *agreed* to enter into a stipulation with the Government as to what her testimony would have been had she been here." (Emphasis added). Defendants noted for the record aspects of Thomas' testimony that the court would not allow into the trial. The court then asked, "With that understanding, [were] the State and Defendant—objection still on the record—able to come to a stipulation as to what Ms. Thomas' testimony would be with those caveats?" Defense counsel acknowledged that they had agreed on a ten point stipulation, stating that they did not agree to paragraphs nine and ten of the stipulation, which the court noted. Those two points were that Thomas could not connect Younger and Lucero and was unaware of a person named Frank Lucero during her undercover narcotics investigation.

{29} This Court has held that a stipulation by defense counsel to the contents of a deposition is not admissible at trial when it violates the defendant's right to confrontation and cross-examination. *Millican v. State,* 91 N.M. 792, 793, 581 P.2d 1287, 1288 (1978). In *Millican,* defense counsel did not stipulate to the truthfulness of the deponent's statements, but rather stipulated that the deponent had made the statements. *Id.* at 792, 581 P.2d at 1287. Millican was unable to cross-examine effectively or otherwise challenge the deponent's statement. *Id.* at 793, 581 P.2d at 1288. We held that this violated his sixth amendment rights, and reversed and remanded for a new trial. *Id. Millican* does not control this case. The witness in question was a defense witness, who would not be subject to cross-examination by Defendants.[1]

---

1. We do note that *Millican* conflicts with other states' approaches to this issue. Other courts have held that "when evidence is offered by way of stipulation, there is no agreement as to the facts which the evidence seeks to establish. Such a stipulation only goes to the content of the

{30} We conclude no error occurred in this case. Defendants *sought* to have Thomas' testimony admitted into the trial rather than forgo having her testimony at all. Defendants cannot expect that they would be able to present Thomas' testimony in the form of a stipulation without the State bringing out in the stipulation how they would expect Thomas to testify on cross-examination. We agree with the State's contention that Defendants accepted paragraphs nine and ten of the stipulation in order to gain the first eight paragraphs of the stipulation.

**4. The trial court properly admitted Lucero's prior consistent statement to Satomba.**

{31} At trial, Satomba testified about Lucero's statement to her regarding the murder. The State argues that her testimony was admissible under the prior consistent statement rule. Rule 11–801(D)(1)(b) NMRA 1998. An out-of-court statement made by a witness who testifies at trial is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Rule 11–801(D)(1)(b). The statement must be made before a motive to fabricate arises. "[O]nly those statements made before the motive originated are non-hearsay and therefore admissible." *Casaus*, 1996–NMCA–031, ¶ 18, 121 N.M. 481, 913 P.2d 669; *accord Salazar*, 1997–NMSC–044, ¶ 66, 123 N.M. 778, 945 P.2d 996.

{32} Defendants contend that Lucero's motive to falsify arose before he told Satomba what happened and, therefore, under *Tome v. United States*, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), and *State v. Casaus*, 1996–NMCA–031, 121 N.M. 481, 913 P.2d 669, the testimony should not have been admitted. We review the admission of evidence under an abuse of discretion standard and will reverse only if its admission is against logic and is " 'clearly untenable or

not justified by reason.' " *See State v. Apodaca*, 118 N.M. 762, 770, 887 P.2d 756, 764 (1994) (quoting *State v. Litteral*, 110 N.M. 138, 141, 793 P.2d 268, 271 (1990)). The question of when a motive to lie arises is a question the trial court answers, reviewable by an appellate court under the abuse of discretion standard. *State v. Salazar*, 1997–NMSC–044, ¶ 65, 123 N.M. 778, 945 P.2d 996.

{33} At trial, when Defendants cross-examined Lucero, they pursued two different lines of questioning to establish that Lucero had the motive to lie prior to the statement he made to Satomba. First, Defendants questioned whether Lucero lied to protect himself from prosecution and gain an immunity deal. Defendants asked Lucero in cross-examination, "And, in order to avoid that time [in jail], you made this deal with . . . the District Attorney's Office, right? . . . [T]his is what's called the immunity, right?" Defendants then asked Lucero about the details of the murder and implied that he was directly involved in the murder:

Q: You've never veered from your position that you're an innocent bystander to the death of Jerol Younger, right?

A: No.

Q: Why is it that you need immunity?

A: Because I drove the BMW, and I also drove the car for them to dispose of the body.

Q: Well, you were innocent, though, right? You didn't do anything wrong?

{34} The State introduced Satomba's testimony that Lucero had told her the same story he told at trial in order to rebut Defendants' implication that Lucero lied to protect himself. Defendants objected to the introduction of this evidence, arguing that Lucero had a motive to fabricate. Defendants argued at trial that, despite their cross-examination challenging Lucero's credibility, his statements to Satomba should not have been admitted since he had a motive to lie in 1992, before he told Satomba his story. In a bench conference, Defendants argued that "the mo-

---

testimony of a particular witness if he or she were to appear and testify. The agreement is to what the evidence will be, not to what the facts are ." *Barnes v. State*, 31 Md.App. 25, 354 A.2d 499, 505 (Ct.Spec.App.1976). "A stipulation of

evidence is not an agreement that the evidence or testimony is admissible or that the testimony is truthful." *Mosquera v. State*, 877 S.W.2d 40, 42 (Tx. Ct.App.1994, no pet.).

tive to fabricate arises at the time of the witness['], Lucero['s] participation in the murder." However, the court responded, "I'm finding, based on the cross-examination done by both [of] you . . . that you attempted to show that the basis for him being—or the motive for him giving testimony here could be to take advantage of the offer of the State." Therefore, the court found Lucero's motive arose in 1994, when he was in protective custody in California, facing murder charges.

### a.

{35} Defendants argue that Lucero's actions in 1992 indicate his motive to lie. According to defense witnesses Denise Purcell–Abeyta and Matilda Gonzales, he began hiding from the police in 1992, and acted strangely from then forward. The State responds that his actions are explainable; they argue his actions arose from fear of those who committed the murder, or fear of being held responsible for a murder he did not commit.

{36} The State argues that to follow Defendants' argument would be to eliminate the admission of any prior consistent statements. It may be argued that a declarant whom a defendant accuses of being involved in the crime and who witnesses that crime may possess a motive to fabricate as soon as the crime takes place because he or she fears prosecution. We cannot so conclude without eviscerating the rule. While we recognize that a declarant may have a motive to lie immediately following the crime, due to the declarant's involvement in the crime, failure to report the crime, and fear of prosecution, such a conclusion must necessarily be a fact-based inquiry. The mere witnessing of a crime does not give rise to a presumption or conclusion that a motive to fabricate existed at the time of the crime. A defendant must elicit more concrete testimony from the declarant to establish a motive to lie.

{37} Here, Defendants have elicited testimony from a witness regarding Lucero's actions immediately following the murder, in 1992. Purcell–Abeyta testified that, in 1992, Lucero came to her and asked to stay with her because he was in trouble. After she questioned him regarding the "trouble," he said he killed Younger, to whom he owed money. She also testified that Lucero became fearful of the police at this time. In addition, in October of 1992, the police searched his home in Albuquerque, where they found a hammerhead, plastic garbage bags, duct tape, and cords, all of which could have been used in the murder of Younger. Defendants argue that this evidence, adduced at trial, showed that Lucero had a powerful motive to lie because of his involvement in the murder and the police suspicion that had begun to focus on him. We agree.

{38} Lucero allegedly admitted he committed the crime in 1992, he became fearful of the police and sought to hide from them, and police began to suspect his involvement and searched the remains of his home. This evidence demonstrated that he had a motive to lie—to protect himself—in October of 1992. This pre-dated his arrival in California, where he stayed with Satomba, by nearly one year. He told Satomba the story he told at trial several days after his arrival. Satomba's testimony would not have been admissible under *Casaus* as substantive evidence because she heard the statements after Lucero's motive to lie arose. However, we conclude that Satomba's testimony was properly admitted as rehabilitative evidence.

### b.

{39} To hold that the trial court abused its discretion in admitting Satomba's testimony regarding Lucero's story, this Court must find that the trial court "acted in an 'obviously erroneous, arbitrary or unwarranted manner.'" *State v. Stills,* 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51 (quoting *State v. Alberico,* 116 N.M. 156, 170, 861 P.2d 192, 206 (1993)). We hold that the trial court did not abuse its discretion when it admitted Satomba's testimony because of other testimony offered at trial.

{40} In *Tome,* the United States Supreme Court focused on the admission of prior consistent statements pursuant to Rule 801(d) of the Federal Rules of Evidence. *Tome,* 513 U.S. at 156, 115 S.Ct. 696. The Court "intimate[d] no view . . . concerning

the admissibility of any of [the declarant's] out-of-court statements under [Rule 803(24) ], or any other evidentiary principle." *Id.* at 166, 115 S.Ct. 696. Additionally, the Court stated that its "holding is confined to the requirements for admission under Rule 801(d)(1)(B)." *Id.* at 167, 115 S.Ct. 696.

{41} The Fourth Circuit has relied on this language from *Tome* to distinguish the introduction of prior consistent statements for purposes of rehabilitation, as opposed to use as substantive evidence. *United States v. Ellis,* 121 F.3d 908, 920 n. 16 (4th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 738, 139 L.Ed.2d 674 (1998). Because Rule 801(d) identifies certain out-of-court statements that are admissible to prove the truth of the matter asserted, in other words, for substantive purposes, the Fourth Circuit reasoned that Rule 801(d) and the United States Supreme Court opinion in *Tome* do not control the introduction of prior consistent statements for the sole purpose of rehabilitating a witness. *Id.* at 919–21.

{42} The Fourth Circuit's interpretation is fairly consistent with the overall reasoning of *Tome,* though there is dicta in *Tome* indicating that the majority had a different understanding of Rule 801(d)(1)(B) than the Fourth Circuit. The United States Supreme Court relied heavily on two sources of authority in its interpretation of Rule 801(d)(1)(B): (1) the common law; and (2) the advisory notes for the Federal Rules of Evidence. *Tome,* 513 U.S. at 159–60, 115 S.Ct. 696. The Court determined that the premotive requirement existed at common law and that the rules committee intended to adopt the common law understanding of prior consistent statements. *Id.* at 160, 115 S.Ct. 696. "The Notes disclose a purpose to adhere to the common law in the application of evidentiary principles, absent express provisions to the contrary." *Id.* The Court noted that the advisory notes did not reveal a purpose to "scuttle" the common law premotive requirement. *Id.* at 161–62, 115 S.Ct. 696.

{43} At common law, prior consistent statements were admissible for rehabilitation on several theories: (1) to place a supposed inconsistent statement in context to refute the alleged inconsistency; (2) to support the denial of making an inconsistent statement; (3) to refute the suggestion that the witness's memory is flawed due to the passage of time; and (4) to refute an allegation of recent fabrication, improper influence, or motive. *See United States v. Rubin,* 609 F.2d 51, 67–69 (2d Cir.1979) (Friendly, J., concurring), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *see also Kellam v. Thomas,* 287 So.2d 733, 734–35 (Fla.Dist.Ct.App.1974). As Justice Breyer noted in his dissent, Rule 801(d) deals only with the fourth theory on which prior consistent statements may be offered. *Tome,* 513 U.S. at 170, 115 S.Ct. 696 (Breyer, J., dissenting).

{44} There is language in *Tome* that suggests that Rule 801(d)(1)(B) is the only source for the admission of prior consistent statements in the Federal Rules of Evidence. For example, the Court stated that "the question is whether [declarant's] out-of-court statements rebutted the alleged link between her desire to be with her mother and her testimony, not whether they suggested that [declarant's] in-court testimony was true. The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Tome,* 513 U.S. at 157–58, 115 S.Ct. 696. In addition, the Court opined that "[i]f Rule 801 were read so that the charge opened the floodgates to any prior consistent statement that satisfied Rule 403, as the Tenth Circuit concluded, the distinction between rejected Uniform Rule 63(1) [allowing any out-of-court statement if the declarant testifies and is subject to cross-examination] and Rule 801(d)(1)(B) would all but disappear." *Tome,* 513 U.S. at 162, 115 S.Ct. 696. These statements could be interpreted to mean that the United States Supreme Court interpreted Rule 801 of the Federal Rules of Evidence as the sole means of admitting prior consistent statements and that even rehabilitative uses must comply with Rule 801 and the premotive requirement. However, we do not believe that *Tome* should be interpreted so broadly or that our Rules of Evidence should be interpreted so narrowly.

{45} First, we construe these statements in *Tome* as dicta because, as the

majority in *Tome* noted, the actual use of the evidence in *Tome* was substantive rather than rehabilitative. 513 U.S. at 165, 115 S.Ct. 696 ("At closing argument before the jury, the Government placed great reliance on the prior statements for substantive purposes but did not once seek to use them to rebut the impact of the alleged motive."). Additionally, the advisory notes indicate that the Federal Rules altered the common law by allowing the use of prior consistent statements offered under the fourth theory, to refute a charge of recent fabrication, as substantive evidence. Thus, the advisory committee appears not to have rejected the common law approach to prior consistent statements but, rather, to have broadened the use of prior consistent statements admissible at common law. As the majority in *Tome* reasoned, " '[w]ith this state of unanimity confronting the drafters of the Federal Rules of Evidence, we think it unlikely that they intended to scuttle entirely [the common-law requirement].' " *Tome,* 513 U.S. at 161, 115 S.Ct. 696 (quoting *United States v. Abel,* 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)). Therefore, we think it is highly unlikely that the drafters intended to "scuttle" three of the four theories under which prior consistent statements were admissible at common law without expressly so indicating. Rather, we believe that prior consistent statements continue to be admissible on these theories *for purposes of rehabilitation,* consistent with the common law, and subject to principles of relevancy and undue prejudice pursuant to Rules 401, 402, and 403. Further, this interpretation is consistent with the traditional understanding of hearsay; the rehabilitative use of the statements does not purport to offer the words for the truth of the matter asserted but, instead, to refute a specific attack against the witness's credibility. *See* Frank W. Bullock, Jr. & Steven Gardner, *Prior Consistent Statements and the Premotive Rule,* 24 Fla. St. U.L.Rev. 509, 539 (1997). It appears that this interpretation is consistent with all of the Federal Circuit Courts of Appeals which have addressed the issue, *see id.,* except for the Ninth Circuit, which has precedent holding the opposite, *United States v. Miller,* 874 F.2d 1255, 1273

(9th Cir.1989), but which currently appears undecided on the matter in the wake of *Tome, United States v. Collicott,* 92 F.3d 973, 982 n. 11 (9th Cir.1996). Our interpretation of *Tome* is also consistent with a recent opinion of the Maryland Court of Appeals. *See Holmes v. State,* 350 Md. 412, 712 A.2d 554, 560 (Md.1998) ("We believe that *Tome* left open the question of whether a prior consistent statement may be admissible for other rehabilitating purposes."). Notwithstanding our interpretation of *Tome,* we believe our Rules of Evidence incorporated the common law rule regarding prior consistent statements. Therefore, we conclude that Rule 11–801 does not prohibit certain limited rehabilitative uses of prior consistent statements.

{46} In this case, Defendants attacked Lucero's credibility on two grounds which allow admission of the prior consistent statement. First, counsel for Defendant Smith suggested on cross-examination of Lucero that Lucero's in-court testimony was inconsistent with his statements to his aunt. At common law, the State would be permitted to introduce the complete statement to his aunt to rebut the suggestion that it was inconsistent, as well as under the doctrine of completeness. *See, e.g., Ellis,* 121 F.3d at 920–21; *cf. Holmes,* 712 A.2d at 559–60 (permitting use of prior consistent statement to rebut impeachment through prior inconsistent statement). Second, counsel for Defendant Smith asked Lucero on cross-examination whether he had admitted killing Younger to his cousin, Denise Purcell–Abeyta, and another woman, Matilda Gonzales; Lucero denied making the admission. Defendants then called Purcell–Abeyta and Gonzales to the witness stand to relate Lucero's alleged admission. At common law, the State could introduce Lucero's consistent statement to Satomba in order to bolster Lucero's denial of making the prior inconsistent statement to Purcell–Abeyta and Gonzales. *See, e.g., State v. Franco,* 365 A.2d 807, 812 & n. 5 (Me.1976); *Brown v. Pointer,* 390 Mich. 346, 212 N.W.2d 201, 203–04 (Mich.1973). Thus, we conclude it was not error for the district court to admit the prior

consistent statement for purposes of rehabilitation.

### B. Issues related to Spikes' testimony

**1. The trial court did not commit reversible error in admitting Spikes' prior consistent statements.**

■ {47} We next examine the trial court's decision to admit evidence of Spikes' prior consistent statements to O'Grady. Defendants argue that O'Grady's testimony regarding Spikes' story about the night of the murder should not have been admitted as prior consistent statements. According to O'Grady, Spikes told her that she and Smith had driven to Albuquerque from San Diego to "work out" their relationship with Younger, that she called Younger and he drove her to Lucero's home, and that he was pulled into the room and she remained outside. She told O'Grady this information in 1994. Defendants argue that the motive for Spikes to lie arose immediately after the murder. The State contends that the motive to lie arose in January, 1993, when she was questioned by police regarding her involvement in the murder. We agree that under *Casaus*, O'Grady's testimony, to the extent she discussed Spikes' statements to her in 1994, was inadmissible. However, O'Grady testified to information that Spikes also gave Jimenes.

{48} Spikes told Jimenes similar information to that told to O'Grady. We agree with the State that Spikes' motive to lie arose in 1993, when she was questioned by police regarding the murder. She told Jimenes a similar story shortly after the murder occurred, before being questioned by police. Under the prior consistent statement rule, the testimony was correctly admitted because the motive to lie had not yet arisen. The trial court did not err in admitting Jimenes' testimony.

■ {49} In view of Jimenes' testimony, O'Grady's testimony about the 1994 conversation was cumulative. Although the trial court erred in admitting O'Grady's testimony about the 1994 conversation, the error was harmless. *See State v. Woodward*, 121 N.M. 1, 10, 908 P.2d 231, 240 (1995) ("The erroneous admission of cumulative evidence is

harmless error because it does not prejudice the defendant.").

**2. The trial court did not err in admitting Spikes' prior inconsistent statements.**

■ {50} Defendants also argue that the trial court abused its discretion in admitting testimony by O'Grady and Jimenes about Spikes' prior inconsistent statements. In 1995, the prior inconsistent statement rule was amended to admit only prior inconsistent statements made under oath: "A statement is not hearsay if ... [t]he declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with the declarant's testimony and was given under oath subject to the penalty of perjury at a trial ... or other proceeding ...." Rule 11–801(D)(1)(a). However, at the time this case was filed, a prior inconsistent statement could be admitted whether it was made under oath or not. *See State v. Baca*, 120 N.M. 383, 391–92, 902 P.2d 65, 73–74 (1995) (noting that amendment requiring prior inconsistent statement to have been made under oath does not apply to defendant whose case was filed prior to effective date); *Mason v. Duckworth*, 74 F.3d 815, 818 (7th Cir.1996) (holding that, because a change in the Indiana rules of evidence requiring out-of-court statements to have been made under oath in order to be admissible is not one of constitutional proportions, defendant is not entitled to have new rule applied retroactively). The record reflects that Spikes had made contradictory statements. For example, at trial, Spikes denied that Defendant Smith asked her to help kill Younger in order to receive his insurance money. Both O'Grady and Jimenes testified that Spikes had told them, individually, that Defendant Smith had asked her to do so. Under the prior-inconsistent-statement rule in 1994, these statements were not hearsay. *See Woodward*, 121 N.M. at 7, 908 P.2d at 237.

{51} Defendants also argue that the trial court erred in admitting testimony by O'Grady and Jimenes of inconsistent statements by Spikes, because " 'impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get

before the jury evidence not otherwise admissible.'" *United States v. Zackson*, 12 F.3d 1178, 1184 (2d Cir.1993) (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975)). The State suggests the principle does not apply because it is intended to limit a party from calling a witness primarily to impeach that witness with otherwise inadmissible evidence; that, in this case, the record supports a conclusion that Spikes gave favorable as well as unfavorable testimony. *See generally Morton v. State*, 689 So.2d 259, 262–64 (Fla.1997) (discussing limitations on the use of prior inconsistent statements to impeach one's own witness).

{52} We think the principle on which Defendants rely has broader application than the State has conceded. In *Morton*, the Florida Supreme Court summarized the most general principles and emphasized the trial court's broad discretion to balance the probative value of particular impeachment testimony against its prejudicial effect.

> Obviously, no single rule can be delineated to cover all of the circumstances under which parties will seek to impeach their own witnesses. Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.

*Id.* at 264.

{53} Under these principles, because Spikes gave both favorable and un-favorable testimony, the prosecution was entitled to offer evidence of any prior inconsistent statements, which the trial court might have been asked to exclude under Rule 11–403, NMRA 1998. In this case, however, neither Defendant made a sufficiently specific objection to alert the trial court to the need to balance the probative value of the testimony in impeaching Spikes against the prejudicial effect of the particular prior inconsistent statements to which O'Grady and Jimenes testified.

{54} Defendant Brown asked the court to exclude O'Grady as a witness on the ground Spikes' motive to lie arose at the time of the murder, and Spikes' conversation with O'Grady occurred in June, 1994. That is a different objection than the argument made on appeal that the prosecution improperly impeached its own witness.

{55} Defendant Smith argued that O'Grady's testimony was not proper either as showing prior consistent statements or prior inconsistent statements, because the testimony was a "means of improper bolstering." He characterized the State's theory and method of trial as "contrived." Defendant Smith made an initial hearsay objection to Jimenes' testimony, as she began to describe statements to her by Spikes. He subsequently asked for a continuing objection and then, again asking for a continuing objection, indicated that he had the same objections to Jimenes' testimony that he had articulated in objecting to O'Grady's testimony.

{56} Smith's objections more closely track the argument made on appeal, but they do not distinguish between inconsistent and consistent statements and thus did not indicate that balancing under Rule 11–403 was required of the trial court. We conclude the particular error argued on appeal was not preserved at trial. Rule 12–216 NMRA 1998. The objections made invoked a ruling on the general, preliminary questions of whether Spikes had made a consistent statement prior to trial that pre-dated a motive to lie and whether she had made statements prior to trial that were inconsistent with her trial testimony. We do not think the trial court

erred in identifying statements Spikes made to O'Grady and Jimenes as inconsistent with her trial testimony. We conclude the more specific argument on appeal was not preserved at trial, and on that basis conclude Defendants have shown no error in the trial court's rulings.

### 3. The trial court properly granted use immunity to Spikes.

{57} Defendant Smith argues that the district court did not have the authority to immunize Spikes from prosecution and to compel her to testify. Specifically, Smith argues that the statute authorizing immunity, NMSA 1978, § 31–6–15 (1978), applies only to grand jury proceedings and not to court proceedings. We agree that Section 31–6–15 is limited to grand jury proceedings. *See State v. Summerall*, 105 N.M. 82, 83, 728 P.2d 833, 834 (1986). However, Section 31–6–15 is not the sole source of authority for the district court's actions. Rule 5–116 NMRA 1998[2] and Rule 11–412 NMRA 1998[3] apply to court proceedings and, if valid, permit the district court to conditionally compel testimony. Smith argues that these rules merely implement Section 31–6–15 and, therefore, do not expand judicial authority to immunize testimony beyond the grand jury context. Smith relies on *Apodaca v. Viramontes*, 53 N.M. 514, 212 P.2d 425 (1949), for the proposition that the principle of separation of powers contained in Article III, Section 1 of the New Mexico Constitution requires statutory authority for grants of immunity. Smith argues that, to apply Rule 5–116 to court proceedings, we must overrule *Apodaca* and that, in doing so, we would

overlook the role of the judiciary in our constitutional scheme of government. We disagree. We hold that the district court properly relied on valid rules of this Court in compelling Spikes' testimony.

#### a.

{58} In order to explain our holding on this issue, it is necessary to distinguish between two separate forms of governmental immunity. Transactional immunity describes an agreement by the government not to prosecute an individual for particular crimes in exchange for testimony or information. *See Piccirillo v. New York*, 400 U.S. 548, 568–69, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971) (Brennan, J., dissenting). By contrast, use or derivative use immunity describes an agreement not to utilize particular testimony, as well as evidence gathered as a result of the testimony, in a future prosecution of the witness. *See State v. Vallejos*, 118 N.M. 572, 576, 883 P.2d 1269, 1273 (1994). Thus, with respect to use immunity, there is no expectation on the witness's part that the State will refrain from prosecuting the witness for crimes related to the witness's testimony.

{59} It is clearly within the province of the Legislature to establish procedures for granting transactional immunity to a prosecution witness. *Apodaca*, 53 N.M. at 518–25, 212 P.2d at 427–31; *see State v. Thoreen*, 91 N.M. 624, 627, 578 P.2d 325, 328 (Ct.App.1978) (calling into question, based on separation of powers and *Apodaca*, an earlier version of Rule 5–116 which provided for immunity from prosecution). *But see Campos v. State*, 91 N.M. 745, 747, 580 P.2d 966,

2. Rule 5–116 states:

A. *Issuance of order.* If a person has been or may be called to testify ... in an official proceeding conducted under the authority of a court or grand jury, the district court for the judicial district in which the official proceeding is or may be held may, upon the written application of the prosecuting attorney, issue a written order requiring the person to testify ... notwithstanding his [or her] privilege against self-incrimination.

B. *Application.* The court may grant the application and issue a written order pursuant to this rule if it finds:

(1) the testimony ... may be necessary to the public interest; and

(2) the person has refused or is likely to refuse to testify ... on the basis of his [or her] privilege against self-incrimination.

3. Rule 11–412 states:

Evidence compelled under an order requiring testimony ... notwithstanding a privilege against self-incrimination, or any information directly or indirectly derived from such evidence, may not be used against the person compelled to testify ... in any criminal case, except a prosecution for perjury committed in the course of the testimony or in a contempt proceeding for failure to comply with the order.

968 (1978) (implicitly approving the version of Rule 5–116 questioned in *Thoreen*). Transactional immunity represents the Legislature's decision to suspend the application of its laws against particular classes of individuals, such as those assisting in the prosecution of others. *See Brown v. Walker*, 161 U.S. 591, 601–02, 16 S.Ct. 644, 40 L.Ed. 819 (1896). As a result, transactional immunity clearly falls within the Legislature's amnesty power. *See Apodaca*, 53 N.M. at 521, 212 P.2d at 429; *see also Brown*, 161 U.S. at 601, 16 S.Ct. 644.[4] Thus, this Court held in *Apodaca* that district attorneys and courts are without power to grant immunity from prosecution "[a]bsent an enabling statute." 53 N.M. at 523, 212 P.2d at 430.

{60} Nonetheless, we do not believe that *Apodaca* is controlling in this case. Unlike transactional immunity (the type of immunity at issue in *Apodaca*), the use immunity granted to Spikes does not involve the application or suspension of legislative enactments. Rather, use immunity has a dual function: (1) compelling a reluctant witness to testify in furtherance of the application of the criminal law; and (2) protecting the witness's constitutional privilege against self-incrimination by precluding the use of particular evidence in future proceedings. We believe both of these functions, as applied in court proceedings, inhere in the judiciary.

{61} "The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo–American jurisprudence." *Kastigar v. United States*, 406 U.S. 441, 443, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Flowing from the judicial function of "determining the facts upon which the substantive rights of the litigant rest," *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 310, 551 P.2d 1354, 1357 (1976), courts have the inherent power to compel the attendance and non-privileged testimony of witnesses. *See* Rule 11–501 NMRA 1998 (providing that "no person has a privilege to: ... refuse to be a witness; or ... refuse to disclose any matter" except as provided by constitution or court rules). To enforce this power, courts inherently possess the ability to hold witnesses in contempt for failing to testify pursuant to court order. *See State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 161–62, 315 P.2d 223, 227 (1957). Additionally, courts are charged with power over testimonial and evidentiary privileges as matters of evidence. *See Ammerman*, 89 N.M. at 309–12, 551 P.2d at 1356–59. Finally, the judiciary has the power to enforce and interpret constitutional provisions, including the Fifth Amendment privilege against self-incrimination, and if necessary to effectuate those constitutional provisions, the judiciary is obligated to proscribe the use of particular types of evidence. *See State v. Gutierrez*, 116 N.M. 431, 444–47, 863 P.2d 1052, 1065–68 (1993) (stating that "the people of New Mexico left to the courts the task of interpreting" constitutional language, and clarifying that the exclusionary rule in New Mexico is a matter of constitutional interpretation). Therefore, to the extent that use immunity serves to compel testimony in a judicial proceeding and serves to establish an evidentiary safeguard to protect the right against self-incrimination, we conclude that it is within our power of "superintending control over all inferior courts" of New Mexico to enact rules governing this type of immunity. *See* NM Const. art. VI, § 3; *cf. State v. Seward*, 104 N.M. 548, 554, 724 P.2d 756, 762 (Ct.App. 1986) ("It is not within the legislature's pur-

---

4. In fact, we believe that transactional immunity is more clearly a legislative, as opposed to executive, function under the New Mexico Constitution than under the United States Constitution due to the fact that the Governor's power of pardon is limited to the time after conviction. *See* NM Const. art. V, § 6 (limiting Governor's power of pardon to time after conviction); U.S. Const. art. II, § 2 (vesting pardon power in the President); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866) (interpreting the President's power of pardon to apply anytime after the com- mission of an offense). *Compare Brown*, 161 U.S. at 638, 16 S.Ct. 644 (Field, J., dissenting) (contending that Congressional immunity statutes improperly interfere with the President's pardon power), *with Doyle v. Hofstader*, 257 N.Y. 244, 177 N.E. 489, 500 (1931) (Pound, J., concurring in part, dissenting in part) (concluding that immunity from prosecution falls under the legislative power of amnesty rather than the executive power of pardon based on limiting language in the New York Constitution), *cited with approval in Apodaca*, 53 N.M. at 521, 212 P.2d at 429.

view to establish or regulate constitutional or judicial procedural rights . . . .").

{62} We recognize that numerous decisions of federal courts place the power over use immunity in the legislative and, by federal statute, the executive branches of government. *See, e.g., United States v. Perkins,* 138 F.3d 421, 424 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1853, 140 L.Ed.2d 1102 (1998); *United States v. Lenz,* 616 F.2d 960, 962 (6th Cir.1980) ("[C]ourts have no inherent power to grant immunity. Nor has the Constitution been construed to authorize courts to compel testimony despite the witness' claim of self-incrimination privilege. Rather, use immunity is a statutory creation.") (citations omitted); *United States v. Rocco,* 587 F.2d 144, 147 & n. 10 (3d Cir. 1978) (citing cases and stating that "it has been uniformly accepted that the grant or denial of immunity is within the sole discretion of the executive branch of government"). However, all of these cases derive their authority, in part, from *Earl v. United States,* 361 F.2d 531, 534 (D.C.Cir.1966).

{63} In *Earl,* then-Circuit Judge Burger, speaking for the court, stated:

What Appellant asks this Court to do is command the Executive Branch of government to exercise the statutory power of the Executive to grant immunity in order to secure relevant testimony. This power is not inherent in the Executive and surely is not inherent in the judiciary. In the context of criminal justice it is one of the highest forms of discretion conferred by Congress on the Executive, *i.e.,* a decision to give formal and binding absolution in a judicial proceeding to insure that an individual's testimony will be compelled without subjecting him to criminal prosecution for what he may say. The effect of the immunity grant avoids any incrimination. . . . We conclude that the judicial creation of a procedure comparable to that enacted by Congress for the benefit of the Government is beyond our power.

*Id.* The Court in *Earl,* therefore, was concerned with transactional immunity rather than use immunity, and as we indicated above, we believe different considerations apply in the context of use immunity. *But see*

*United States v. Allstate Mortgage Corp.,* 507 F.2d 492, 494–95 (7th Cir.1974) (concluding that the principles articulated in *Earl* apply equally to use immunity). Additionally, decisions of the United States Supreme Court indicate that courts may compel testimony over the privilege against self-incrimination and, to protect the privilege, preclude the future use of that testimony for purposes of criminally prosecuting the witness. *See Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (holding that a defendant's testimony in furtherance of a motion to suppress evidence on Fourth Amendment grounds is not admissible at trial to prove guilt); *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (adopting an "exclusionary rule" whereby the federal government is precluded from using a state witness's testimony, or fruits of the testimony, compelled under a state immunity agreement). *But see Pillsbury Co. v. Conboy,* 459 U.S. 248, 261, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) (stating in dicta that "[n]o court has authority to immunize a witness"). These decisions indicate that the judiciary has the inherent power to grant use immunity as long as it does not infringe upon the legislative power of amnesty or the prosecutorial discretion of the executive. Finally, the federal cases concluding that the judiciary possesses no authority to grant immunity relied on the existence of a federal statute placing that authority in the executive branch. *See Ellis v. United States,* 416 F.2d 791, 796–97 (D.C.Cir.1969) ("This is an area that has been considered by Congress and where it has acted with care and particularity, limiting the power to grant immunity—in the presence of a valid claim of privilege—to a limited group of federal officials. We need not consider what would be the legal situation in the absence of such a statute. With that statute on the books, the power to grant immunity is plainly outside the judicial province.") (footnotes omitted). By contrast, we have no such statute in New Mexico. *See State v. Cheadle,* 101 N.M. 282, 286, 681 P.2d 708, 712 (1983) ("Since there is no constitutional provision or statute in this State allowing application for the granting of immunity to defense witnesses, we must follow the rule of criminal procedure . . . .").

{64} We conclude that Rule 5–116 and the district court's grant of immunity to Spikes do not interfere with the Legislature's amnesty power. We also conclude that, because the rule requires application of the prosecuting attorney, *see Cheadle,* 101 N.M. at 286–87, 681 P.2d at 712–13 (rejecting a claim for authority by a defendant to demand witness immunity), the grant of use immunity under Rule 5–116 does not interfere with the prosecutorial discretion of the executive. *But cf. United States v. Mohney,* 949 F.2d 1397, 1401 (6th Cir.1991) ("Compelled judicial use immunity could ... impair the subsequent prosecution of the witness."); *United States v. Turkish,* 623 F.2d 769, 775–76 (2d Cir.1980) (discussing the potential negative impact of use immunity on the prosecution). *See generally United States v. Alessio,* 528 F.2d 1079, 1081 (9th Cir.1976) ("It has long been recognized that the Executive Branch of government 'has exclusive authority and absolute discretion to decide whether to prosecute a case ....' ") (quoting *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

### b.

{65} In *Kastigar,* the United States Supreme Court held that a federal use immunity statute [5], which compelled testimony notwithstanding a witness's invocation of Fifth Amendment privilege, survived constitutional scrutiny due to sufficient safeguards against the use of the testimony, or its fruits, in any future prosecution. 406 U.S. at 459–62, 92 S.Ct. 1653; *see Vallejos,* 118 N.M. at 575–77, 883 P.2d at 1272–74. Smith might contend that Rule 5–116, unlike the statutory immunity at issue in *Kastigar,* does not protect Spikes' Fifth Amendment rights with sufficient certainty. However, we conclude that Smith lacks standing to argue such a

claim. *Compare United States v. Skolek,* 474 F.2d 582, 584 (10th Cir.1973) ("The privilege against self-incrimination is solely for the benefit of the witness and is purely a personal privilege of the witness, not for the protection of other parties."), *and People v. Douglas,* 50 Cal.3d 468, 268 Cal.Rptr. 126, 788 P.2d 640, 656 (1990) (en banc) ("[D]efendant lacks standing to object to any perceived violation of [the witness's] privilege against self-incrimination. That right is personal, and may not be vicariously asserted by another."), *with Ellis,* 416 F.2d at 799 (concluding that, although "[o]rdinarily a defendant does not have standing to complain of an erroneous ruling on the scope of the privilege of a witness," a "defendant does have standing ... to complain that [a] conviction was obtained in a case where the trial judge went outside [the] judicial province to grant immunity to a witness").

{66} In any event, we see no discernible difference between a statutory provision and comparable, properly enacted, court rules; Rule 5–116 and Rule 11–412 leave "the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege" and, therefore, are "coextensive with the privilege," *Kastigar,* 406 U.S. at 462, 92 S.Ct. 1653. Certainly, in any subsequent prosecution of Spikes, the State, as with statutory immunity, will be subject to the same burdens imposed by *Kastigar. See Vallejos,* 118 N.M. at 577, 883 P.2d at 1274 (discussing the prosecutorial burdens established by the United States Supreme Court in order to protect against Fifth Amendment violations). We believe that Rule 5–116 and Rule 11–412 strike a constitutionally permissible balance between the State interest in prosecuting crime and the private interest against self-incrimination. The only substantive distinction between the immunity discussed in *Kast-*

---

5. Whenever a witness refuses, on the basis of his [or her] privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to ... a court or grand jury of the United States, ... and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his [or her] privilege against self-incrimination; but no testimony or other information compelled under

the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.
18 U.S.C. § 6002 (1994); *see* 18 U.S.C. § 6003 (1994) (providing for request for order compelling testimony by United States Attorney and for the granting of such an order by a court or grand jury of the United States).

*igar* and the immunity provided in Rule 5–116 and Rule 11–412 lies in the branch of government empowered to enact such a provision in the Federal government as compared to the State of New Mexico. *Cf. Maples v. State,* 110 N.M. 34, 39, 791 P.2d 788, 793 (1990) (Montgomery, J., dissenting) (discussing New Mexico's separation of powers doctrine in relation to matters of court procedure and noting a greater participation by Congress at the federal level as compared to the New Mexico Legislature at the state level).

{67} We hold that the judicial branch is a proper arm of government under the New Mexico Constitution to establish and administer use immunity. We also hold that Rule 5–116 and Rule 11–412 satisfy the requirements of the Fifth Amendment to the United States Constitution. Therefore, we reject Smith's contention that the district court lacked the authority to immunize Spikes' testimony and affirm the district court's reliance on Rule 5–116 in the context of a court proceeding.

**4. Defendant Smith failed to lay a proper foundation for Spikes' character testimony about other witnesses.**

{68} Smith claims that his case was damaged when the trial court refused to allow Smith to question Spikes about her opinion of the prosecution witnesses' character for truthfulness. While Smith was entitled to inquire into the reputation of witnesses for truthfulness, he had to lay a foundation for doing so. He did not do this, and therefore, his claim has no merit.

{69} "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness ...." Rule 11–608 NMRA 1998. A proper foundation must be laid. *Construction Contracting & Management, Inc. v. McConnell,* 112 N.M. 371, 376, 815 P.2d 1161, 1166 (1991). Both Spikes and Lucero testified that they did not know each other well. O'Grady, rather than Spikes, testified subsequently that they were good friends. We conclude that Smith failed to lay a proper foundation for Spikes' opinion of Lucero's and O'Grady's veracity. Spikes did testify that Jimenes had been a "close friend." Spikes' other testimony, however, sufficiently indicated her opinion of Jimenes' veracity. Spikes clearly believed Jimenes' testimony that contradicted her own was untrue. We conclude that if the trial court erred in denying Spikes' opinion of Jimenes' veracity, the error was harmless.

## C. Accomplice Witness Instruction, Sufficiency of Evidence, and Due Process.

{70} Defendants argue that the trial court erred in failing to give an instruction cautioning the jury to carefully weigh the immunized testimony of Lucero. As Defendants concede, we do not require courts to give instructions specifically cautioning a jury in considering immunized accomplice testimony. Rather, we only require that the trial court instruct the jury generally with respect to witness credibility. *State v. Ortega,* 112 N.M. 554, 575, 817 P.2d 1196, 1217 (1991). The trial court so instructed the jury, using UJI 14–5020 NMRA 1998 ("You alone are the judges of the credibility of the witnesses and the weight to be given to the testimony of each of them. In determining the credit to be given any witness, you should take into account [the witness'] truthfulness or untruthfulness, [the witness'] ability and opportunity to observe, his [or her] memory, his [or her] manner while testifying, any interest, bias or prejudice [the witness] may have and the reasonableness of [the witness'] testimony considered in the light of all the evidence in the case."). We conclude that the trial court did not err by refusing to give an additional jury instruction specifically relating to the credibility of accomplice witnesses.

{71} We recently declined to require a cautionary instruction concerning accomplice testimony in *State v. Sarracino,* 1998–NMSC–022, ¶ 17, 125 N.M. 511, 964 P.2d 72. In *Sarracino,* we discussed the rationale of other states and the federal government in requiring or approving an instruction cautioning the jury to more closely

scrutinize accomplice testimony. *Id.* ¶¶ 14–16. We noted that accomplice testimony has been viewed, historically, with suspicion, and we emphasized "the due process requirement that there be sufficient evidence to support, beyond a reasonable doubt, every element essential to the crime charged." *Id.* ¶ 14. We concluded in *Sarracino* that, under the facts of that case, the general witness credibility instruction adequately informed the jury of its responsibility in reviewing the accomplice testimony. *Id.* ¶ 17.

{72} We believe the majority of Defendants' arguments on appeal reinforce our emphasis on due process and sufficiency of the evidence in *Sarracino*. The essence of Defendants' appeal concerns the fact that the State relied so heavily on the accomplice testimony of Spikes and Lucero. Defendants separately attack the immunity of both accomplices (claiming Lucero's to be coercive and Spikes' to be without authority), the State's attempts to bolster the accomplices' testimony (claiming the prior consistent statements related by Satomba, O'Grady, and Jimenes to be hearsay), and, finally, the blocked attempts to attack the credibility of prosecution witnesses (focusing on the inability to introduce Lucero's prior arrests and Spikes' opinion about other witnesses' truthfulness). We believe that, viewing these arguments in combination, Defendants basically contend that Spikes' and Lucero's testimony is not sufficiently reliable to constitute sufficient evidence to sustain a conviction beyond a reasonable doubt as a matter of due process.

{73} As we concluded in *Sarracino,* however, we believe there is sufficient evidence corroborating the accomplice testimony in this case to satisfy the dictates of due process. Both Spikes and Lucero testified to a similar sequence of events, even though both were involved in different aspects of the crime and had limited contact with each other prior to the crime and before the trial. Additionally, the physical evidence discovered by the police at Lucero's house corroborated many details of Lucero's testimony and was consistent with the condition in which the police found Younger's body. Defendants had, and employed, every opportunity to cross-examine both Lucero and Spikes. They then argued in closing that neither witness was credible. Defendants have not shown any persuasive reason to change the rule we currently have. We hold the jury was sufficiently instructed. .

## V. *FEAR TESTIMONY*

{74} Finally, Defendants claim that the admission of Satomba's, O'Grady's and Jimenes' testimony that they feared Defendants was error. This is an issue of first impression in New Mexico. Other courts which have reached this issue have held that a witness may testify regarding his or her fear of a defendant if the testimony is elicited to explain a delay in reporting the crime or admitting knowledge of the crime to the police. *See State v. Coffey,* 345 N.C. 389, 480 S.E.2d 664, 672 (1997). "In general, questions concerning a witness's fear of testifying are appropriate in the judge's discretion." *Commonwealth v. Fitzgerald,* 376 Mass. 402, 381 N.E.2d 123, 131 (Mass.1978); *accord Commonwealth v. Auguste,* 418 Mass. 643, 639 N.E.2d 388, 390 (Mass.1994). We adopt this rule.

{75} Each of these witnesses failed to report what they knew about the crime immediately. The prosecution was allowed to show why the witnesses delayed in contacting police. The trial court did not err in admitting the testimony of witnesses that they feared Defendants.

## VI. *CONCLUSION*

{76} Defendants are not entitled to a new trial or to a remand for a *Brady* hearing. The trial court did not err in admitting Lucero's testimony or that of Spikes, nor in admitting testimony of Lucero's statements to Satomba, of Spikes' statements to Jimenes, and of Spikes' prior inconsistent statements to O'Grady. We agree that the trial court erred in admitting hearsay testimony of Spikes' prior consistent statements to O'Grady but hold that the error was harmless. The trial court did not err in refusing to allow Spikes to offer her opinion of the veracity of Lucero and O'Grady. If the court erred in denying Spikes' opinion of Jimenes'

veracity, the error was harmless. The trial court did not err in admitting the stipulated testimony of Karen Thomas or the evidence that various witnesses delayed reporting to police because they feared Defendants. The trial court did not err in failing to give an instruction cautioning the jury to view the testimony of Lucero and Spikes with suspicion or in refusing to instruct on voluntary manslaughter. The cumulative error doctrine is not applicable. Defendants have not shown a sufficient basis for compelling disclosure of additional evidence. We therefore affirm the convictions.

{77}   **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA, SERNA and McKINNON, JJ., concur.