**William H. DIKE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 98–254.

Supreme Court of Wyoming.

Nov. 30, 1999.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Director of the Wyoming Defender Aid Program; and Daniel Pedriana and Brenda Hammitt, Student Interns for the Wyoming Defender Aid Program.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Director of the Prosecution Assistance Program; and Monique DuPont Armijo and Jodi A. Weppner, Student Interns for the Prosecution Assistance Program.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN & HILL, JJ.

MACY, Justice.

Appellant William Dike appeals from the judgment and sentence that was entered after a jury found him guilty of aggravated assault and battery.

We affirm.

## ISSUES

Dike presents several issues for our review:

### ISSUE I

Did the state fail to prove that William Dike committed aggravated assault since he did not use a "deadly weapon?"

### ISSUE II

Did the trial court deprive William Dike of his due process right to a fair trial by failing to instruct the jury on the elements of aggravated assault?

### ISSUE III

Did the trial court err by allowing unfairly prejudicial evidence to be introduced at trial, whereby a reasonable juror could be so inflamed as to infer that because of all the guns and ammunition seized from the Dike residence, William Dike must have committed the aggravated assault?

### ISSUE IV

Did the trial court abuse its discretion by allowing hearsay evidence of a taped phone call that does not qualify for the excited utterance exception to be heard by the jury?

### ISSUE V

Did the trial court abuse its discretion by allowing the jury to hear portions of a taped phone call that do not qualify for the excited utterance exception to the hearsay rule?

### ISSUE VI

Did the trial court violate Billy Dike's right to confrontation, his right to testify in his own behalf, and his right to receive due process and a fair trial when the court allowed the prosecutor to remark in clos-

ing that Mr. Dike's right to be present during his own trial gave him an unfair advantage as a witness and that a conviction was required in order to uphold the community's trust in the jury?

## ISSUE VII

Did the ineffectiveness of William Dike's counsel deny him his due process right to a fair trial?

## FACTS

Shortly after arriving home on November 1, 1997, at approximately 11:00 p.m., the victim heard someone pounding on her door. She went to the door and found Dike, who hollered: "Open this door." The victim knew Dike because he had worked for her and her husband and he had previously been a guest in their home. She opened the door, and Dike walked into her house, informing her that he needed to use her telephone. The victim agreed to let him use her telephone, but, feeling uncomfortable, she remained near the door. She did not believe that Dike actually used the telephone because he did not turn on the light in the room where the telephone was located and she did not hear him pick up the receiver. When she asked him if he got a hold of anyone, he responded that the line was busy.

Because of the victim's uneasiness about being alone with Dike, she told him that she could not visit with him because she had to go back to work at the Buffalo Lodge, that a friend was spending the night, and that her husband would be back from hunting that night, all of which were untrue. She walked out the door, and Dike followed her outside. When she tried to get into her car, Dike pulled her out. When she attempted to get into her car again, he again pulled her out. After a brief struggle, Dike told the victim that she was going with him and pointed a pistol at her head, telling her: "I will use this if I have to." The victim ultimately convinced Dike to let her take her car. Dike got into the car with the victim and began accusing her of telling her husband about the sexual advances he had made toward her the previous summer. The victim denied telling

her husband anything and tried to persuade Dike to give her the gun.

The victim was finally able to convince Dike to give her the gun, which she held in her left hand while she drove toward the Buffalo Lodge. When she arrived at the Buffalo Lodge, she spoke with a new employee and told him that she was going to take Dike to his truck and that she would return to train him, hoping he would get suspicious if she did not come back. When they got to Dike's truck, Dike told the victim that he would kill himself if she called the police. The victim assured Dike that she would not call the police and gave the gun back to him. At that point, Dike showed the victim that the gun was not loaded. He exited her vehicle and followed her as she drove back toward the Buffalo Lodge.

While she was on her way back to the Buffalo Lodge, the victim used her cellular telephone to call her mother-in-law, who advised her to call the police. Although she was apprehensive about doing so, the victim did call the police from the Buffalo Lodge and asked to speak with Deputy Sheriff Jake Hardin. During this telephone conversation, the victim told the dispatcher what had happened and also communicated it to Deputy Hardin. Deputy Hardin, along with two detectives from the Laramie County sheriff's office, went to Dike's home and arrested him. Searches of the house on separate occasions netted various guns and ammunition.

Dike was charged with aggravated assault and kidnapping. At the trial, Dike acknowledged that he went to the victim's home, that they had an argument, and that he rode with her to the Buffalo Lodge, but he denied threatening the victim with a gun. A jury convicted Dike of the aggravated assault offense, and the trial judge sentenced him to serve a term in a state penal institution of not less than two years nor more than five years. Dike appeals from his conviction to this Court.

## DISCUSSION

### A. Definition of a "Deadly Weapon"

█ In his first claim of error, Dike contends that the state failed to prove that he

committed aggravated assault because the only evidence relating to the deadly weapon requirement of the offense was that he possessed an unloaded gun. The state counters that it was not required to establish that the firearm was loaded in order to prove that Dike committed aggravated assault.

Wyo. Stat. Ann. § 6-2-502(a)(iii) (LEXIS 1999) describes the aggravated assault offense:

> (a) A person is guilty of aggravated assault and battery if he:
>
> . . .
>
> (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another . . .

The term "deadly weapon" is defined in Wyo. Stat. Ann. § 6-1-104(a)(iv) (LEXIS 1999) as follows:

> (iv) "Deadly weapon" means but is not limited to a firearm, explosive or incendiary material, motorized vehicle, an animal or other device, instrument, material or substance, which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury[.]

Dike contends that the phrase "which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury" qualifies each of the previously listed items, including "a firearm."

■ In deciding this issue, we must apply our well established standard for construing statutes. We attempt to interpret statutes in accordance with the legislature's intent. *State Department of Revenue and Taxation v. Pacificorp*, 872 P.2d 1163, 1166 (Wyo.1994). We begin by making an " 'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.' " *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker*, 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe statutes as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statutes

on the same subject. *State ex rel. Wyoming Workers' Safety and Compensation Division v. Bruhn*, 951 P.2d 373, 376 (Wyo.1997); *Pacificorp*, 872 P.2d at 1166. We give effect to the plain language of unambiguous statutes. *Lyles v. State ex rel. Division of Workers' Compensation*, 957 P.2d 843, 846 (Wyo.1998). We resort to extrinsic aids of statutory interpretation, such as legislative history or intent, only when statutes are ambiguous. *Christensen v. Oedekoven*, 888 P.2d 228, 230 (Wyo.1995).

■ In making the determination of whether this statute is clear and unambiguous, we must analyze the structure and position of the words in the statute, applying rules of common grammatical principles. " 'This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments.' " *Management Council of Wyoming Legislature v. Geringer*, 953 P.2d 839, 843–44 (Wyo.1998) (quoting *Flora v. United States*, 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960)).

■ After analyzing § 6-1-104(a)(iv), we conclude that the language is clear and unambiguous. The phrase "which in the manner it is used" modifies only the last antecedent, "other device, instrument, material or substance." "[O]ther device" is preceded by an "or," and, generally, where no contrary intention appears, relative and qualifying words and phrases are construed to refer solely to the last antecedent with which they are closely connected. *Moschetti v. Liquor Licensing Authority of City of Boulder*, 176 Colo. 281, 490 P.2d 299, 301–02 (1971) (en banc).

The aggravated assault statute enhances the punishment if the defendant uses a deadly weapon because deadly weapons cause a greater degree of fear in the person being assaulted. The victim does not know that the firearm is not loaded, and his apprehension and consequent reactions will be the same as if the firearm were loaded. He may try to escape or defend himself, conceivably putting himself and others into a precarious and dangerous situation. *Id; see generally*

*Sindelar v. State,* 932 P.2d 730, 733 (Wyo. 1997); *ALJ v. State,* 836 P.2d 307, 310–11 (Wyo.1992) (recognizing the danger created when an unloaded firearm is pointed at an individual).

We hold that the "deadly weapon" definition includes unloaded firearms. It necessarily follows that an assault with an unloaded gun is elevated to the offense of aggravated assault. This is consistent with the cases where we held that unloaded firearms are deadly weapons for the purposes of the aggravated burglary statute. *Britt v. State,* 734 P.2d 980, 981 (Wyo.1987); *Sutherland v. State,* 944 P.2d 1157, 1162 (Wyo.1997).

## B. Instruction

Dike also claims that the trial court denied him his due process right to a fair trial by instructing the jury that a firearm is a deadly weapon. He maintains that the jury should have been permitted to make the determination of whether an unloaded gun qualifies as a deadly weapon.

 The trial court is given wide latitude in instructing the jury. *Duckett v. State,* 966 P.2d 941, 943 (Wyo.1998). We will not find reversible error if the instructions correctly state the law. *Id.*

As we discussed in the last issue, an unloaded firearm is by definition a "deadly weapon." This determination is, therefore, not one to be made by the jury. Because the instruction was a correct statement of the law, the trial court did not err by giving it.

## C. Evidence of Seized Handguns and Ammunition

Dike next asserts that the trial court erred by allowing evidence into the trial of "a plethora of guns and ammunition" which was seized from the Dike residence after his arrest. He claims that the evidence was so unfairly prejudicial that it likely contaminated the minds of the jurors and prevented them from objectively deciding the case.

Dike testified at the trial that he did not have a gun during his argument with the victim, and law enforcement officials were unable to locate a gun matching the victim's description. After arresting Dike, however, officers searched the residence in which Dike lived with his parents and seized a number of other guns, along with a variety of ammunition. Defense counsel filed a motion in limine wherein he argued that the introduction of a .22 caliber handgun would violate W.R.E. 401, 402, and 403. The motion was denied, and the evidence was allowed into trial without further objection. Dike contends that his motion in limine was sufficient to preserve an objection and escape the application of the plain error standard of review of the evidence regarding this particular gun. He acknowledges that the plain error standard of review must be employed with regard to the testimony concerning the other firearms and ammunition.

 This Court has not addressed the issue of whether a motion in limine is sufficient to preserve an objection, and we do not consider this case to be an appropriate one in which to invoke that rule of law. The motion did not address the specific testimony with which Dike takes issue nor did it demonstrate how W.R.E. 401, 402, and 403 would be violated if the officers' testimony were allowed. Furthermore, the trial court did not make a final ruling on the evidentiary issues raised in Dike's motion, opting instead to make specific determinations upon proper objections at the trial. Accordingly, our review is limited to a search for plain error.

A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced.

*Bradley v. State,* 635 P.2d 1161, 1164 (Wyo. 1981); *see also Hodgins v. State,* 962 P.2d 153, 156 (Wyo.1998).

 "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice." *Hermreck v. State,* 956 P.2d 335, 340 (Wyo.1998); *see also* W.R.E. 403. Before this Court will

conclude that the trial court erroneously admitted unduly prejudicial evidence, the appellant "must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury." *Apodaca v. State*, 627 P.2d 1023, 1027 (Wyo. 1981); *see also Hermreck*, 956 P.2d at 340.

 Dike complains about the testimony from Detective Bruce Dexter, Detective John Haukup, and Deputy Hardin, who detailed the guns and ammunition that were found at the Dike residence. Quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5215, at 278 (1978), Dike maintains that the testimony "'dominat[ed] the mind of the jury'" and prevented it from making a "'rational determination of the truth.'"

Dike did not object to the challenged testimony, and he is unable to overcome his burden to demonstrate that a clear and unequivocal rule of law was violated because the probative value of this evidence outweighed any prejudicial effect. Dike was charged with threatening to use a drawn firearm. The fact that various handguns, along with ammunition, were found in the house was relevant to show that Dike had these types of weapons available to him. The defense elicited testimony that the officers did not know whether any of the seized items belonged to Dike. The jury, therefore, had a complete picture and was able to weigh the evidence and draw reasonable inferences therefrom. We agree with the state's observation that it is unlikely a Wyoming jury would become so inflamed by the fact that a defendant owns or has access to guns that it would abandon its duty to reach a rational verdict on the basis of the evidence and the court's instructions.

 Dike also challenges testimony from his ex-girlfriend regarding his "habit" of carrying a handgun in his truck. She testified that Dike kept handguns in his truck during the time that they dated, which was approximately three to four years prior to the trial. Dike objected to this testimony, citing W.R.E. 404, 405, and 406. The ex-girlfriend also identified one of the pistols seized from the Dike residence as being one of the guns

Dike carried in his truck. Dike argues on appeal that the testimony concerned activities too remote in time to be relevant to the current charges against him.

W.R.E. 406 provides:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

The ex-girlfriend's testimony was relevant because it demonstrated that Dike owned or had access to guns which made the possibility that he had a gun in his truck on the night in question more likely. Dike has not cited authority for his proposition that his ex-girlfriend's knowledge of his habits was too old to be relevant. We defer to the sound discretion of the trial court and its decision to allow the jury to consider the remoteness of the evidence in deciding what weight to give to it.

 We come to the same conclusion regarding the relevance of the victim's husband's unchallenged testimony that Dike had told him on several occasions that he had a handgun in his pickup. This testimony was relevant to the charged crime in that it too made the likelihood more probable that Dike had a gun on the night in question.

### D. Taped Telephone Conversation

 Dike complains that the trial court abused its discretion by allowing the jury to hear portions of the victim's taped telephone call to the Platte County sheriff's office. The state responds that the trial court properly admitted the tape as excited utterances, prior consistent statements, and statements of a then-existing state of mind.

In general, rulings on the admissibility of evidence are within the sound discretion of the trial court and are entitled to considerable deference. Such rulings will not be disturbed on appeal absent demonstration of a clear abuse of discretion. This court will not find an abuse of discretion as long as a legitimate basis exists for the trial

court's rulings. Thus, unless the court acted in a manner exceeding the bounds of reason, no abuse of discretion will be found.

*Brown v. State,* 953 P.2d 1170, 1175 (Wyo. 1998) (citations omitted).

A tape recording was made of the telephone call from the victim to the sheriff's office. Dike filed a motion in limine, seeking to bar its admission on the ground that it was hearsay. The state countered that the tape was admissible under the excited utterance exception to the hearsay rule. The trial court denied the motion, holding that it was premature, and ordered the state to submit to counsel and the court those portions of the tape which it proposed to offer at trial. The trial court also ordered the parties to "present written facts and arguments as to whether the statements qualify under a hearsay exception" for purposes of making a preliminary ruling on their admissibility. The state complied with this order, but Dike did not. Before trial, the court ruled that the statements were admissible as excited utterances and as prior consistent statements.

At the trial, the state introduced four portions of the tape through the dispatcher for the sheriff's office. Dike's counsel objected, and, although the trial court overruled the objection, it allowed the defense a continuing objection.

W.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 803 provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (2) *Excited utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

■ This Court has outlined five factors that are intended to guide trial courts in determining whether hearsay statements qualify as excited utterances. *James v.*

*State,* 888 P.2d 200, 206 (Wyo.1994). Those factors are as follows:

1. The nature of the startling event;

2. The declarant's physical manifestation of excitement;

3. The declarant's age;

4. The lapse of time between the event and the hearsay statement; and

5. Whether the statement was made in response to an inquiry.

*Clarke v. Vandermeer,* 740 P.2d 921, 927 (Wyo.1987); *see also James,* 888 P.2d at 206. Although these factors are useful in determining whether the evidence qualifies as an excited utterance, the ultimate inquiry must be whether the " 'declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation.' " *LP v. Natrona County Department of Public Assistance and Social Services (Matter of GP),* 679 P.2d 976, 1003 (Wyo.1984) (quoting *United States v. Iron Shell,* 633 F.2d 77, 86 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)); *see also James,* 888 P.2d at 206.

■ Dike contends that the taped statements did not constitute excited utterances because the statements were made approximately thirty minutes after the incident occurred; the victim repeated the night's events three times in response to questions from the dispatcher; the incident was not all that startling; and the victim displayed presence of mind following the incident in that she asked to speak to her friend, she requested that her conversation not go over the scanner, she did not want anyone to know about it for fear Dike would kill himself, she concealed the fact that she called her mother-in-law on her cellular telephone, and she was able to converse with the sheriff's office for over thirty minutes.

After analyzing the taped conversation in question, we agree that the victim's statements during that telephone conversation qualified as excited utterances. The tape reveals that the victim was frightened and distraught following the incident. It is also apparent that the victim remained extremely agitated throughout the entire telephone call.

Although the victim ultimately learned that the gun was unloaded, that fact does not change the terror she must have felt when Dike pointed it at her head nor does it mean that she had nothing more to fear. That the victim displayed some presence of mind after the incident does not convince us that she lacked the necessary degree of spontaneity or impulsiveness to qualify her statements as excited utterances. To the contrary, the tape reveals exactly the opposite. It demonstrates that, despite the lapse of time between the incident and the telephone call and despite her knowledge that the gun was not loaded, the incident was ongoing in the victim's mind. *See James,* 888 P.2d at 206 (holding that a lapse of fifteen to twenty minutes did not preclude a statement from qualifying as an excited utterance). She was very concerned that Dike had followed or was watching her. Our review of the conversation also reveals that, although the dispatcher asked the victim questions about what happened, many of the victim's statements were not really in response to the dispatcher's inquiries, and it appears that the questioning was really an attempt by the dispatcher to calm the victim.

Dike also complains about statements on the tape from other individuals that were played for the jury. During the debate about whether the tape should be allowed into evidence, the state announced its intention to play only portions of it. Dike argued that the state should play the entire tape rather than isolate and play only the most damaging statements. Dike now argues, however, that portions of the tape were unfairly prejudicial.

Dike first directs our attention to a statement made by the employee who was at the Buffalo Lodge with the victim when she made the telephone call. The state argues that this statement was admissible as a present sense impression and as a then-existing mental or emotional condition.

Our review of the tape shows that the victim became frightened because a car was approaching the lodge and she was worried that it was Dike. The dispatcher asked to speak to the employee who stated that he had just seen a white and blue pickup truck "at the rest stop just now and it was just slowly driving around." The dispatcher then asked whether the employee had "any idea where [Dike] might have gone or what he might be" doing. The employee replied: "[M]y feeling right now he's probably watching." The challenged statement qualified as a statement of his then-existing state of mind pursuant to W.R.E. 803(3). It was a statement of what the witness was perceiving at the time, and its admission did not result in error.

Dike also complains about Deputy Hardin's comments that "I've seen it before, it[']s a ploy to get your sympathy. And then to hold a gun, he thinks if he scares you enough that you'll come along with him. Okay. You did nothing wrong ... don't fault yourself for it, okay"; "Bill Dike has not been playing with a full load for a long time. And he's aggravated a lot of people"; and "But he put a gun to your head. That's aggravated battery. Whether it was loaded or not. He cannot point a gun at you and get away with it." Dike maintains that these comments were tantamount to improper and prejudicial opinion testimony and that they resulted in per se reversible error. We disagree.

The rule of law expressed in *Bennett v. State,* 794 P.2d 879, 881 (Wyo.1990), and *Stephens v. State,* 774 P.2d 60, 68 (Wyo.1989), cited by Dike, does not require a per se reversal in this case. In *Dudley v. State,* 951 P.2d 1176, 1178 (Wyo.1998), we held that the *Bennett/Stephens* rule of per se reversible error was not applicable because the per se rule does not require reversal absent the direct solicitation of the testimony from the prosecutor and an express opinion as to the guilt of the defendant. We explained that, in such a situation, the effect of the testimony must be analyzed against " 'the factual backdrop' of the case using 'the most careful exercise of delicate judicial judgment.' " 951 P.2d at 1179 (quoting *Whiteplume v. State,* 841 P.2d 1332, 1340–41 (Wyo.1992)).

The comment was not directly solicited by the prosecutor in this case, and, therefore, error per se will not attach. Given the lack of a specific objection, we must

analyze this argument using our plain error standard of review. In *Whiteplume,* we stated: "In measuring the quantum of harm caused by the error, we considered the strength of the prosecution's case against the accused." 841 P.2d at 1340.

An appropriate discussion of this matter requires a more complete recitation of the context of Deputy Hardin's statements:

[VICTIM]: Listen to me. I don't want anybody to get hurt over this. I don't know what I'm doing. I mean, I wasn't even gonna call you.

[DEPUTY HARDIN]: Well ... it[']s best you did.

[VICTIM]: Jake, what the hell is happening?

[DEPUTY HARDIN]: Well, what it is, I've seen it before, it[']s a ploy to get your sympathy. And then to hold a gun, he thinks if he scares you enough that you'll come along with him. Okay. You did nothing wrong. Okay. And you don't need to ..., I know it hurts hon. But you don't fault yourself for it, okay.

[VICTIM]: What is going on with me?

[DEPUTY HARDIN]: It[']s not you ..., it's him. Bill Dike has not been playing with a full load for a long time. And he's aggravated a lot of people. Now you, you've got to quit blaming yourself. You did nothing wrong. Okay?

[VICTIM]: Jake, [the employee] thinks that he's still out there. I don't even, I can't even tell you what the hell he was in, Jake.

[DEPUTY HARDIN]: Well I've seen his truck and I know what Bill Dike Jr. looks like.... I'm going to come down there.

[VICTIM]: [unintelligible] Please I don't want him to know, Jake.

[DEPUTY HARDIN]: You don't want him to what?

[VICTIM]: I don't want him to know, Jake, I don't want him to kill himself. I can't live with myself if he kills himself.

[DEPUTY HARDIN]: He's not gonna kill himself okay. What I'll do is I'm gonna come down there just on regular patrol. Okay. I'll act like it[']s regular patrol. But he put a gun to your head. That's aggravated battery. Whether it was loaded or not. He cannot point a gun at you and get away with it.

Our review of this particular colloquy leads us to conclude that the challenged statements were made in an effort to calm the victim and to assure her that calling the sheriff's office was the right thing to do. The statements were an integral part of the conversation with the victim which contained her excited utterances. We believe that the jurors understood that the decision regarding Dike's guilt or innocence was theirs to make after hearing all the evidence and that they recognized Deputy Hardin made the statements to calm and reassure the victim before he could have formed an informed opinion because he made them before he knew all the facts and circumstances surrounding the incident. After carefully considering these statements in light of the other evidence that the state presented against Dike, we cannot say Deputy Hardin's statements were so prejudicial that a reasonable possibility exists that, without them, the verdict would have been more favorable to him. We do, however, caution the prosecution that its decision to play the statements was extremely dangerous, given that a slightly different set of facts could have ended in a reversal if not a reversal per se, resulting in an unfortunate waste of judicial resources.

 Dike also claims that the dispatcher's testimony concerning the substance of the taped conversation was extremely prejudicial cumulative hearsay. Our review of the record discloses that her testimony on direct examination laid foundation for the admission of the tape by identifying and authenticating it and that she described the substance of the tape only generally. To the extent any of her testimony was redundant, we hold that the trial court's decision to allow it did not fall outside the bounds of reason as it put that portion of the taped conversation in context for the jury. As a related matter, Dike complains that the trial court improperly admitted the transcript of the entire taped conversation. Again, we do not find that this materially prejudiced Dike. Certainly no abuse of discretion was demonstrated.

### E. Hearsay Testimony

 Dike asserts that the trial court abused its discretion and committed plain error when it allowed the jury to hear the hearsay testimony of eight witnesses who repeated the story that the victim told to them. The state counters that the testimony was admissible as prior consistent statements.

Dike objected to only some of the testimony that he challenges on appeal. To the extent that he lodged a proper objection, we will use an abuse of discretion standard of review to analyze the challenged comments. Our review of the testimony that Dike did not object to will be limited to a search for plain error. Because we utilized both standards of review earlier in this opinion, we will not restate them here.

Without belaboring the testimony of the eight witnesses, suffice it to say that each one testified generally about what the victim told him or her happened with Dike. Dike claims that the victim had a motive from the outset to fabricate her story when she and he drove to the lodge where an employee happened to be outside, smoking a cigarette. Dike insists that, because this employee saw him and the victim together in the car, the victim had to concoct some story to explain why she was out with another man while her husband was away on a hunting trip.

Dike relies on *Tome v. United States*, 513 U.S. 150, 165, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), wherein the United States Supreme Court, interpreting the federal rule regarding prior consistent statements, held that prior consistent statements are admissible only when the motive to fabricate occurred between the two statements. He maintains that each repetition of the victim's story came after the motive to fabricate a story was present and, therefore, should not have been allowed into evidence.

This Court settled that issue in *Makinen v. State*, 737 P.2d 345, 349 (Wyo.1987), where we held:

> There is no express condition in the rule which states that the prior consistent statement must be made before the alleged improper motive to fabricate arose. In the

absence of an express prohibition, we think the trial court should have the discretion to determine whether a prior consistent statement should be admitted whether or not it was made before an improper motive to fabricate arose.

Later, in *Stephens*, we stated that a prior consistent statement may be admitted for the truth of the matter asserted only when it was made before the improper motive to fabricate arose and that, if the statement was made afterwards, it was admissible only for purposes of rehabilitation. 774 P.2d at 71. We also required:

> Should the trial court find that the improper influence or motive or the claim of recent fabrication antedated the consistent statement, and yet still determine that the probative value justifies admission, a limiting instruction must be given, if requested, to the effect that the statement may be considered only for the limited purpose of evaluating the credibility of the declarant witness and that it should not be considered directly as proof of the matter asserted.

774 P.2d at 71–72. The reason for allowing prior consistent statements when they were made after the alleged improper influence or motive to fabricate arose is because " it is the consistency, rather than the substance of the consistent statement, which takes such a statement out of the realm of objectionable hearsay and tends to prove the value of the original statement." *Curl v. State*, 898 P.2d 369, 374 (Wyo.1995).

 We hold that the trial court did not abuse its discretion or commit plain error by allowing the prior consistent statements into evidence. The statements were made after the alleged improper influence arose and, therefore, should have been "considered only for the limited purpose of evaluating the credibility of the declarant witness," but, because Dike did not request a limiting instruction, the trial court did not err by not giving one. *Stephens*, 774 P.2d at 71; *see also Frenzel v. State*, 849 P.2d 741, 751 (Wyo. 1993).

## F. Prosecutorial Misconduct

 Dike next complains that the prosecutor improperly commented on his right to be present and to testify at his own trial when he said: "You know there is something else about the defendant, who sits through the trial, has an opportunity to testify, and then gets on the witness stand, and tailors his testimony for you based upon what he has heard and what he thinks you might take—." We review claims of prosecutorial misconduct by using the following standard of review:

> Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argument is measured in the context of the entire argument. A trial court's rulings as to the scope of permissible argument will not be disturbed absent a "clear or patent" abuse of discretion. Even then, reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict.

*Arevalo v. State,* 939 P.2d 228, 230 (Wyo. 1997) (citations omitted); *see also Gayler v. State,* 957 P.2d 855, 860 (Wyo.1998). Counsel are afforded wide latitude in the making of their closing arguments. *Sides v. State,* 963 P.2d 227, 232 (Wyo.1998). The scope of permissible argument is best determined by the trial judge. *Id.*

For the purpose of our discussion, we have put the prosecutor's remarks into the context in which they were made:

> [PROSECUTOR:] You know there is something else about the defendant, who sits through the trial, has an opportunity to testify, and then gets on the witness stand, and tailors his testimony for you based upon what he has heard and what he thinks you might take—
>
> [DEFENSE COUNSEL]: Objection, your Honor. I think that is improper closing.
>
> THE COURT: Overruled.

> [PROSECUTOR]: I am arguing the credibility of the defendant.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: Apparently, the defendant must have found the state's case convincing. He virtually agreed with all the facts, except those which necessarily convicted him.

Dike claims that the remarks invited the jury to consider the fact that he testified in his own defense as evidence of his guilt, thereby penalizing him for exercising his rights to be present, to confront the witnesses against him, and to testify in his own defense. As support for his argument, Dike cites *Agard v. Portuondo,* 117 F.3d 696, 708–09 (2d Cir. 1997), *cert. granted,* —— U.S. ——, 119 S.Ct. 1248, 143 L.Ed.2d 346 (1999), where the United States Court of Appeals held that a similar comment violated Agard's constitutional rights to confrontation, to testify in his own behalf, and to receive due process and a fair trial. On petition for rehearing, however, the court retreated "from any language in our prior opinions suggesting that it is constitutional error for a prosecutor to make a factual argument that a defendant used his familiarity with the testimony of the prosecution witnesses to tailor his own exculpatory testimony." *Agard v. Portuondo,* 159 F.3d 98, 99 (2d Cir.1998). The majority reasoned:

> Although one factual element of such an argument may be the presence of the defendant during the trial, its principal focus is on a comparison of defendant's testimony with the testimony of other witnesses. Such an argument, unlike that made here, depends on what the defendant testified to regarding pertinent events, rather than focussing solely on his presence in the courtroom.

*Id.* In the case at bar, the prosecutor's argument did highlight the differences in the testimony. The following comments were made just prior to the comments that Dike challenges in this appeal:

> Now, [the victim] described for you, and it was uncomfortable, she described to you exactly what the crude sexual overture was, and she said that's what they were arguing about and discussing, and the de-

fendant was upset about her having told her husband ... about that.

Contrast that with the defendant's testimony. He said they were arguing about something, about telling [the victim's husband], but he never really said what. He left it very vague; and he left a gaping hole, which can be filled only by the truth that you heard from [the victim] about what their dispute was.

■■■■ We also find support for the propriety of the remarks in our own case law. This Court has held that the purpose of closing arguments is to afford counsel the opportunity to explain the significance of the evidence and how it should be viewed by the jury. *Harper v. State*, 970 P.2d 400, 403 (Wyo.1998). During closing arguments, counsel may assist the jury by reflecting upon the evidence and drawing reasonable inferences that logically flow from the evidence. *Gayler*, 957 P.2d at 861. When the jury is presented with contradictory testimony, counsel is allowed to communicate the reasonable inference that one of the witnesses is lying. *Barela v. State*, 787 P.2d 82, 84 (Wyo.1990).

■■■■ Dike also contends that the prosecutor improperly appealed to the jurors' prejudice or passion for their state and community when he told the jury that the State of Wyoming trusted its judgment. The prosecutor made the following final remarks:

[PROSECUTOR:] You know, the defendant's lawyer argues that you should acquit his client. What else would you expect? Ladies and gentlemen, if you feel that the defendant's conduct should permit his acquittal, set him free. Send him back to the community. Acquit him. If you feel the state failed to prove each of those elements that we discussed earlier, each of the elements of the crimes charged here, acquit the defendant. That it your duty.

You, ladies and gentlemen, are the final deciders of the facts. You know better. The state asks you to convict the defendant. The people of the State of Wyoming and this community trusts—

[DEFENSE COUNSEL]: Objection, your Honor. Improper argument.

THE COURT: I don't know where it's going. Overruled.

[PROSECUTOR]: The people of the State of Wyoming, ladies and gentlemen, trust your judgment.

In *Gayler*, we warned against community outrage arguments which improperly appeal to a jury's prejudice or passion:

Arguments which are designed to appeal to the jury's prejudice or passion are improper. The fear in allowing such appeals is that the accused will be convicted for reasons wholly irrelevant to her guilt or innocence. "Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear."

957 P.2d at 861 (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985)) (citations omitted). In *Gayler*, we found that the prosecutor's repeated statements inviting the jury to take a stand with law enforcement in the war on drugs and find the defendant guilty in the face of sustained objections was an improper community outrage argument because it appealed to the jury's passion and prejudice against drug-related crimes. *Id.* We were concerned in that case that the remarks were a "blatant invitation to the jurors to convict Gayler not on the evidence but because of their fear and disapproval of drug dealers in general." 957 P.2d at 861–62. The comments at issue here, however, do not rise to the same level of impropriety. The prosecutor merely told the jury that the people trusted its judgment. We do not view the comment as being an improper community outrage appeal and are unmoved by Dike's attempt to characterize it as such.

## G. Effective Assistance of Counsel

Dike's last contention is that he was denied his constitutional right to have effective assistance of counsel at his trial. Specifically, he complains about his counsel's failure to argue that an unloaded gun is not a deadly weapon for purposes of the aggravated as-

sault statute, to object to the introduction of the guns and ammunition testimony, and to object to the hearsay testimony of the witnesses who repeated the victim's story.

■ In order to prevail on his claim of ineffective assistance of counsel, Dike must make the dual showings that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Smith v. State*, 959 P.2d 1193, 1198 (Wyo. 1998). Dike has failed to make the first required showing.

■ We addressed the claims of error throughout this opinion that Dike makes the basis of his ineffective assistance of counsel argument. As we stated in our discussion of the first two issues, the definition of "deadly weapon" includes a firearm, whether or not it was loaded at the time of its use. The fact that Dike's counsel did not assert an incorrect legal argument does not render his representation defective.

■ We turn to Dike's complaint that his counsel did not object to the testimony regarding the guns and ammunition that were seized from his home or to the testimony of the witnesses who testified about what the victim told them happened. As we discussed earlier in this opinion, the testimony was admissible. That Dike's counsel did not make a futile objection to admissible testimony does not cause us to doubt his performance or question the soundness of the verdict.

Affirmed.

LEHMAN, Chief Justice, dissenting.

I cannot agree with the majority that an audio tape introduced into evidence by the prosecutor that included Deputy Hardin's objectionable statement of "he put a gun to your head. That's aggravated battery" was not "directly solicited by the prosecution in this case." Maj. op. at 1023. In addition, I would hold the hearsay statements were im-

properly admitted under W.R.E. 801(d)(1)(B) as prior consistent statements.

*Solicited Statements*

While Hardin's statements were not directly solicited from the prosecutor in the traditional sense of witness examination, the record reveals the prosecutor wished to play excerpts from the tape but did not excise the portion of the tape that included Officer Hardin's statements.[1] It is not as if a witness volunteered the testimony to the prosecutor's surprise. Instead, the record establishes that introduction of these statements was the result of a deliberate choice by the prosecutor. I am led to the inescapable conclusion that Deputy Hardin's statements, played to the jury by audio tape, were directly solicited by the prosecutor.

The only question, therefore, is whether Officer Hardin's statements amount to an opinion of Dike's guilt. Rather than comparing the objectionable statement, "he [Dike] placed a gun to your head. That's aggravated battery," to other cases—*compare Whiteplume v. State*, 841 P.2d 1332, 1337–39 (Wyo.1992) (In response to prosecutor's question of "What did you do at that point?" deputy sheriff testified that "I listened to her [complaining witness'] story and made a determination that she had been raped."); *Newport v. State*, 983 P.2d 1213, 1215 (Wyo. 1999) (In response to prosecutor's question of "what was your reaction to the victim at the time," prosecution witness answered "[w]e believed her."); *Brown v. State*, 953 P.2d 1170, 1181 (Wyo.1998) (In response to prosecutor's question whether witness had anything against the accused and his co-conspirator, witness answered "Just the fact that they killed somebody.")—the majority states:

We believe that the jurors understood that the decision regarding Dike's guilt or innocence was theirs to make after hearing all the evidence and that they recognized Deputy Hardin made the statements to calm and reassure the victim before he

---

1. In a related matter, the majority states that "Dike argued that the state should play the entire tape rather than isolate and play only the most damaging statements." Maj. op. at 1022. That seems to imply that Dike made this argument prior to the introduction of the tape. However,

it was only after the tape was played at trial, during his cross-examination of the witness through whom the prosecutor introduced the tape, that Dike's counsel contemplated playing the entire tape. He eventually chose not to do so.

could have formed an opinion because he made them before he knew all the facts and circumstances surrounding the incident.

Maj. op. at 1023. That belief may or may not be accurate because of the "impossibility of assessing whether the jury relied upon [those statements] in reaching its verdict." *Stephens v. State*, 774 P.2d 60, 68 (Wyo.1989); *Bennett v. State*, 794 P.2d 879, 882 (Wyo. 1990).

### Hearsay

Next, I do not agree with the majority's interpretation of W.R.E. 801(d)(1)(B) concerning admission of prior consistent hearsay statements. I would revive the analysis approved by this court in *Chambers v. State*, 726 P.2d 1269 (Wyo.1986), the same analysis accepted by the United States Supreme Court in *Tome v. United States*, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), and require that the motive to fabricate must come after the hearsay statements in order for those statements to be admissible as prior consistent statements under W.R.E. 801(d)(1)(B). Therefore, I would hold that admission of hearsay by eight prosecution witnesses, repeating the victim's story, was improper and amounted to prejudicial error.[2]

Although this court attempted to clarify its position on this issue in *Stephens v. State*, 774 P.2d at 70–72, the current state of the law is less than clear ten years later. The general rule is that prior consistent statements are not admissible where the person making those statements has testified fully in open court and been available for cross-examination. *Chambers v. State*, 726 P.2d at 1273; *Stephens v. State*, 774 P.2d at 70. Rule 801(d)(1), W.R.E,[3] creates an exception to the general rule which, if satisfied, allows prior consistent statements into evidence. In

*Chambers*, we recited the following rule on admission of prior consistent statements:

A witness's prior consistent statements are not admissible under Rule 801(d)(1)(B), W.R.E., unless they were made before the alleged fabrication or improper influence. Statements made by a witness after corrupting forces come into play could be just as fabricated as trial testimony and do not rebut the charge of fabrication just because they are consistent with his testimony at trial.

726 P.2d at 1273 (citations omitted).

However, in the later case of *Makinen v. State*, 737 P.2d 345, 349 (Wyo.1987), as the majority observes, this court shifted course mid-stream. There the court wrote:

There is no express condition in the rule which states that the prior consistent statement must be made before the alleged improper motive to fabricate arose. In the absence of an express prohibition, we think the trial court should have the discretion to determine whether a prior consistent statement should be admitted whether or not it was made before an improper motive to fabricate arose.

Faced with this inconsistency, the court in *Stephens v. State*, 774 P.2d 60, attempted to reconcile *Chambers* and *Makinen*, drawing a distinction between prior consistent statements used for rehabilitative/credibility purposes and those that would be permitted as substantive evidence. The *Stephens* court wrote:

Should the trial court find that the improper influence or motive or the claim of recent fabrication antedated the consistent statement, and yet still determine that the probative value justifies admission, a limiting instruction must be given, if requested, to the effect that the statement may be

---

**2.** In its brief, the State contends that testimony of "only three" witnesses was admitted as prior consistent statements. It argues that, of the other five witnesses, three witnesses' statements were admitted as excited utterances and the testimony of two other witnesses was introduced without objection. However, because the majority treats all of the statements as prior consistent statements, I will do the same.

**3.** W.R.E. 801 provides:

(d) *Statements which are not hearsay.*—A statement is not hearsay if:
(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

considered only for the limited purpose of evaluating the credibility of the declarant witness and that it should not be considered directly as proof of the matter asserted.

774 P.2d at 71–72.

I find the distinction between rehabilitative/credibility use and substantive use of the statements, as a practical matter, provides a distinction without a difference. First, as the *Stephens* court recognized, even if the statements are admitted only for rehabilitative purposes, whether the statements were admitted before or after the declarant testified was of little consequence: "preadmission may be justified as harmless error if the declarant does testify later in a manner that is consistent with a prior statement." 774 P.2d at 71. Second, while the *Stephens* court suggests that a limiting instruction will assist the jury in its consideration of the prior consistent statements, even the dissenting justices in *Tome* recognized that such limiting instructions are either misunderstood or ignored by juries. 513 U.S. at 171, 115 S.Ct. at 707–08. Finally, "[w]hen a witness presents important testimony damaging to a party, the party will often counter with at least an implicit charge that the witness has been under some influence or motive to fabricate," thus opening the floodgates to prior consistent statements that need only satisfy Rule 403. *Id.* 513 U.S. at 162, 115 S.Ct. at 703.

I believe *Chambers* embodies the appropriate interpretation of W.R.E. 801(d)(1)(B), and the United States Supreme Court has held likewise. In *Tome v. United States*, 513 U.S. 150, 156, 115 S.Ct. 696, 700, 130 L.Ed.2d 574, the Court held that the drafters of F.R.E. 801(d)(1)(B) intended that rule to embody the common law requirement that a prior consistent statement has no relevancy to refute a charge of fabrication unless the consistent statement was made before the source of bias, interest, influence, or incapacity originated. This interpretation was based upon the plain language of the rule, legislative history, and analysis of the policies underlying the adoption of the rule. In reaching its conclusion, the United States Supreme Court noted that "[t]he Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Tome*, 513 U.S. at 157–58, 115 S.Ct. at 701. Thus, the kind of impeachment contemplated and covered by the rule is the kind for which the premotive temporal requirement makes the most sense:

> Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is, as a general matter, capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive. By contrast, prior consistent statements carry little rebuttal force when most other types of impeachment are involved.

*Tome*, 513 U.S. at 158, 115 S.Ct. at 701.

Without this requirement, parties desiring to fabricate stories would have merely to repeat their stories to numerous people and they would have ready-made witnesses who could sway juries with their numbers. However, "repetition does not imply veracity." *Stephens*, 774 P.2d at 72. Perhaps more importantly the interpretation accepted by the majority would shift the emphasis in trial to out-of-court statements, not the in-court ones. *Tome*, 513 U.S. at 165, 115 S.Ct. at 705. The late Justice Cardine explained:

> There is good reason for the rule excluding prior consistent statements. If the rule were otherwise, parties could prepare a multitude of self-serving, biased, inflammatory, video, audio, and written statements for trial; testify; and then introduce into evidence these consistent statements made prior to testifying. There would be no opportunity for cross-examination. The statements, as exhibits, might go with the jury and be used during deliberations. The same testimony would be repeated several times, unduly emphasizing that testimony over all other testimony in the case.

*Baum v. State*, 745 P.2d 877, 882 (Wyo.1987) (Cardine, J., specially concurring).

My research reveals that every state high court addressing the issue has adopted the

*Tome* temporal limitation, reasoning that, to be admissible under Rule 801(d)(1)(B), the prior consistent statement must precede the motive to fabricate. *See, e.g., Cole v. State,* 307 Ark. 41, 818 S.W.2d 573 (1991); *Shellito v. State,* 701 So.2d 837 (Fla.1997); *Bouye v. State,* 699 N.E.2d 620 (Ind.1998); *State v. Johnson,* 539 N.W.2d 160 (Iowa 1995); *Smith v. Commonwealth,* 920 S.W.2d 514 (Ky.1995); *State v. Littlefield,* 540 A.2d 777 (Me.1988); *Holmes v. State,* 350 Md. 412, 712 A.2d 554 (1998) (adopting *Tome* but allowing prior consistent statements under unique Maryland rule with no federal counterpart); *Owens v. State,* 666 So.2d 814 (Miss.1995); *State v. Veis,* 289 Mont. 450, 962 P.2d 1153 (1998); *State v. Morris,* 251 Neb. 23, 554 N.W.2d 627 (1996); *Peterson v. State,* 103 Nev. 455, 744 P.2d 1259 (1987); *State v. Leinen,* 598 N.W.2d 102 (N.D.1999); *State v. Haslam,* 663 A.2d 902 (R.I.1995); *State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998); *State v. Carter,* 164 Vt. 545, 674 A.2d 1258 (1996); *State v. Quinn,* 200 W.Va. 432, 490 S.E.2d 34 (1997). *But see, People v. Eppens,* 979 P.2d 14, 19 (Colo.1999) (declining to reach the issue of whether 801(d)(1)(B) embodies a premotive requirement); *State v. Chew,* 150 N.J. 30, 695 A.2d 1301 (1997) (allowing prior consistent statements to support witness credibility but declining to resolve whether New Jersey's rule contains the *Tome* temporal requirement); *State v. Brown,* 126 N.M. 338, 969 P.2d 313 (1998) (allowing certain limited rehabilitative uses of prior consistent statements).

Although some courts have noted that *Tome* leaves open the possibility of admitting prior consistent statements under Rule 803(24), it appears Wyoming stands alone in explicitly rejecting *Tome* on state law grounds. Not only do I believe *Tome* to be a correct interpretation of the rule, but adopting *Tome* would allow consistent application of Rule 801(d)(1)(B) in both Wyoming's federal and state courts. *See State v. Johnson,* 539 N.W.2d at 165.

Finally, since the Wyoming Rules of Evidence are based upon and are virtually identical to the federal rules, the *Tome* analysis is valid here. "The Wyoming Rules of Evidence are based on the policy that conformity to federal practice is more important than uniformity of state practice." Wyoming Rules of Evidence, Committee note. Accordingly, this court has chosen to follow the lead of the federal courts and adopt federal interpretations of the rules of evidence in previous cases. *See, e.g., Vigil v. State,* 926 P.2d 351, 354 (Wyo.1996). We should follow the lead of the United States Supreme Court in *Tome,* thus reaffirming *Chambers v. State,* 726 P.2d 1269.

For the foregoing reasons, I respectfully dissent.