This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                    **NO. 32,169**

**RICKY GONZALES,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Michael E. Vigil, District Judge**

Gary K. King, Attorney General
Corinna Laszlo-Henry, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**VANZI, Judge.**

{1}     Defendant appeals his convictions for escape from custody of a peace officer, two counts of disarming a peace officer, and aggravated battery on a peace officer. Defendant makes four arguments on appeal. He first argues that the State presented insufficient evidence to support the jury's verdict that he did not act in self-defense with respect to the disarming and aggravated battery counts. Second, Defendant contends that there was insufficient evidence that he deprived the peace officer of the use of the officer's knife. Defendant also argues that because he was not in custody for commission or alleged commission of a felony, his conduct does not constitute escape from custody. Finally, Defendant argues that discovery violations require reversal of his convictions. We agree with Defendant, and the State concedes, that Defendant's conduct did not support the statutory crime of escape from custody. We therefore remand with instructions to vacate this conviction and enter an amended judgment and sentence. We affirm Defendant's remaining convictions.

**BACKGROUND**

{2}     The following is an overview of the events that took place on the night of February 16, 2011. We will supplement the facts as necessary in the Opinion. The facts recited here are obtained from the trial testimony of the witnesses, as well as from the videotape of the encounter that was recorded by Officer Steven Carroll's in-car camera. The videotape was admitted as evidence and played for the jury.

Although much of the encounter was not captured on video, the officer's microphone recorded the struggle and other key events that took place off-camera.

{3}     At 11:30 p.m. on February 16, 2011, New Mexico State Police Officer Steven Carroll was on patrol along a four-lane divided road when he observed a car with a cracked—but illuminated—taillight in the far lane going the opposite direction. Officer Carroll decided to stop the car and made a U-turn to catch up with the vehicle and make a stop. The driver of the vehicle, Defendant Ricky Gonzales, turned off the road onto a side street, and then pulled into a driveway. Officer Carroll pulled in behind Defendant's car and turned on his emergency lights, triggering the audio for his dash-cam video.

{4}     When Officer Carroll approached the vehicle, he noted that there was a passenger in the car and that the driver was in an "odd" position, like he was trying to exit the vehicle, causing Officer Carroll to have a "heightened sense of alertness." As a result, Officer Carroll drew his gun and held it at a depressed level. Defendant told Officer Carroll that his window could not roll down and that the door had to be opened from the outside. With Officer Carroll's assistance, the door was opened, and when Officer Carroll could see that neither occupant was armed, he holstered his weapon. When asked to provide his driver's license, Defendant informed Officer Carroll that he did not have it and provided instead the name and date of birth for "Luis Orta." Shortly thereafter, Officer Carroll handcuffed Defendant and placed him

3

in the back seat of the police unit because the passenger was not complying with Officer Carroll's orders, and Officer Carroll was trying to "control the situation."

**{5}** Officer Carroll removed the handcuffs from Defendant and conducted a brief DWI investigation after which he determined Defendant was not impaired; however, he decided to arrest Defendant for driving under a revoked license based on an arrest warrant then pending in the criminal information database for Luis Orta. After getting his handcuffs out, Officer Carroll told Defendant to stand in front of the police unit. Defendant did a "football maneuver," pushing off Officer Carroll and ran away. At that point, Officer Carroll started chasing Defendant and yelling at him to stop or he would be tased. When Defendant did not stop, Officer Carroll fired his taser. Defendant continued to run until, a short time later, he tripped or fell to the ground. A struggle ensued.

**{6}** Defendant quickly got on top of Officer Carroll and started hitting him on the face and head with what felt like a rock. Officer Carroll could "feel the blood coming down [his] face [.]" Defendant tried to take Officer Carroll's gun, but Officer Carroll protected it while yelling at Defendant, "just go Luis, I'm not going to tell anybody, just go[.]" At some point while Defendant was still on top of Officer Carroll, there was a struggle over Officer Carroll's gun. Officer Carroll aimed at what he believed was Defendant's center mass, and shot twice. Defendant continued to struggle and tried to pull the gun out of Officer Carroll's hand while yelling for Officer Carroll to

4

give him the gun. Either before or after the shooting, Officer Carroll also tried to use the taser again, but the electrified wires were tangled between the two men, and he shocked himself as well.

{7} Defendant and Officer Carroll continued to fight and, while keeping the gun tucked under his leg, Officer Carroll pulled out his utility knife and tried to stab Defendant to get him off. Defendant managed to get possession of the knife and stabbed Officer Carroll in the abdomen. He also tried to choke Officer Carroll with the police radio cord and his arm, and bit Officer Carroll's thumb and head as they fought.

{8} Shortly thereafter, Defendant stopped fighting and left. Officer Carroll got on his knees and tried to shoot Defendant but discovered that the magazine had been removed from the gun and there was no bullet in the chamber. When the gun failed to fire, Officer Carroll radioed for help. Officers from various agencies responded immediately, and some Santa Fe police officers found Defendant a short distance away, against a wall and under a tree; he was face down and bleeding. Underneath where Defendant had been laying, the officers found Officer Carroll's knife.

{9} After a pre-trial discovery dispute in which the district court denied Defendant's motion to exclude witnesses and a request for continuance, the case went to trial. At trial, the district court denied Defendant's motions for directed verdict on Count Three (disarming Officer Carroll of his knife) and Count Five (escape from a peace officer).

5

Ultimately, the jury acquitted Defendant of Count One (attempted murder) but convicted him of the remaining four counts: Count Two (aggravated battery on a peace officer); Count Three (disarming a peace officer of his knife); Count Four (disarming a peace officer of his firearm); and Count Five (escape from a peace officer). This appeal followed.

**DISCUSSION**

**Escape From Custody**

{10}     Defendant contends that his conviction for escape from custody was based on a warrantless, misdemeanor arrest that is not covered by the escape statute. *See* NMSA 1978, § 30-22-10 (1963) (stating that in order to be convicted of escape from custody, a person must be in custody for the commission of a felony, either under a warrant or otherwise). The State concedes that Defendant's conduct in fleeing from Officer Carroll did not, as a matter of law, constitute escape from custody as that crime is defined by the Legislature and that Defendant's conviction for escape from custody should therefore be vacated. Although we are not bound by this concession, *see State v. Foster*, 1999-NMSC-007, ¶ 25, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶¶ 31, 35, 142 N.M. 120, 164 P.3d 1, we agree and express our appreciation to counsel for the State for her candor. We remand to the district court to vacate Defendant's conviction for escape from custody and enter an amended judgment and sentence.

**Disarming a Peace Officer of His Knife**

{11}	"When reviewing a verdict for sufficiency of the evidence, our role is to determine whether a rational fact-finder could determine beyond a reasonable doubt the essential facts necessary to convict the accused." *State v. Garcia*, 2005-NMSC-017, ¶ 12, 138 N.M. 1, 116 P.3d 72. We view the evidence in the light most favorable to the verdict and resolve all conflicts and indulge all permissible inferences to uphold the conviction, disregarding all evidence and inferences to the contrary, to ensure that each element of the crime was established beyond a reasonable doubt. *See State v. Rojo*, 1999-NMSC-001, ¶¶ 19, 23, 126 N.M. 438, 971 P.2d 829. The reviewing court does "not re-weigh the evidence to determine if there was another hypothesis that would support innocence or replace the fact-finder's view of the evidence with the appellate court's own view of the evidence." *Garcia*, 2005-NMSC-017, ¶ 12. Our Supreme Court has also observed, however, "that [e]vidence equally consistent with two hypotheses tends to prove neither." *Id.* (alteration in original) (internal quotation marks and citation omitted). "In other words, evidence equally consistent with two inferences does not, without more, provide a basis for adopting either one—especially beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

{12}	In this case, the jury was instructed in a manner consistent with the statutory provision relating to disarming a peace officer. *See* NMSA 1978, § 30-22-27(A) (1997) (stating that disarming a peace officer consists of knowingly removing a

weapon from a peace officer *or* depriving a peace officer of the use of a weapon). The parties agreed at trial that Defendant did not actually remove the weapon from Officer Carroll, and the instruction thus states, in relevant part, that to convict under Count Three, the jury had to find the following elements:

1.  [D]efendant did knowingly deprive [Officer] Carroll[,] a peace officer[,] the use of a knife when the officer was acting within the scope of his duties;

2.  [D]efendant did not act in self defense[.]

The sufficiency of the evidence is to be measured against this instruction. *See State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883.

{13}     Defendant contends that there was insufficient evidence to support Count Three, disarming a peace officer, because the evidence failed to establish that he knowingly deprived Officer Carroll of the use of his knife. We are not persuaded.

{14}     Officer Carroll testified that during the struggle, and while Defendant was on top of him, Officer Carroll grabbed his utility knife from his left pocket and tried to stab Defendant. Further, Officer Carroll testified that he either dropped the knife or Defendant disarmed him and that all he knew was that he no longer had the knife in his hand. The next thing Officer Carroll knew was that Defendant had possession of the knife, and Defendant stabbed Officer Carroll with it once right below his vest. The knife was later found in the location where Defendant was found laying on the ground.

8

{15} We conclude that there was sufficient evidence for the jury to conclude that during the ensuing struggle, and while Officer Carroll was trying to stab Defendant, Defendant knowingly deprived Officer Carroll of his knife—whether it was dropped or Officer Carroll was actually disarmed. Indeed, there was sufficient evidence for the jury to find that Defendant took the knife with the intent of stabbing Officer Carroll thus depriving Officer Carroll of its use. This was not a situation, as Defendant suggests, where there was some obligation "that a suspect who finds a dropped weapon return it to the officer." The two here were engaged in a struggle at some point during which Defendant took possession of Officer Carroll's knife and used it to stab Officer Carroll. Defendant then took the knife with him necessarily depriving Officer Carroll of its use. We affirm the conviction for Count Three.

**Sufficiency of the Evidence on Self-Defense**

{16} Defendant argues that his convictions under Count Two, aggravated battery on a peace officer, and Counts Three and Four, disarming a peace officer (knife and firearm), must be vacated because there was insufficient evidence that Defendant was not acting in self-defense. As we have noted above, when determining whether a conviction is supported by substantial evidence, we view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all inferences in

9

favor of the verdict. *See Rojo*, 1999-NMSC-001, ¶¶ 19, 23. A claim of self-defense is available against peace officers when the fact-finder determines that the force employed by the officer was excessive. *State v. Ellis*, 2008-NMSC-032, ¶ 16, 144 N.M. 253, 186 P.3d 245. The right to self-defense, however, is not available when the officer is using necessary force to effect an arrest. *Id.*

{17} In this case, the jury was instructed that, with regard to Counts One, Two, Three and Four, evidence was presented that Defendant acted in self-defense and that the burden was on the State to prove beyond a reasonable doubt that Defendant did *not* act in self-defense. The instruction further provided, in part, that Defendant acted in self defense if "[t]he officer used greater force than reasonable and necessary by brandishing . . . his duty pistol when he approached [D]efendant and/or Officer Carroll's use of his TASER on [D]efendant and/or Officer Carroll having shot [D]efendant with a gun and/or Officer Carroll's attempt to stab [D]efendant with his knife." We review the evidence of use of force by Officer Carroll under the objective reasonableness standard. *See id.* ¶¶ 31, 34 (noting that our task on appeal is to inquire whether reasonable minds could differ regarding the officer's use of force and find it excessive). In *Ellis*, our Supreme Court further noted that the necessity or reasonableness of an officer's use of force has to be judged according to some objective standard of police conduct. *Id.* ¶ 22 n.2.

{18} We begin with the first part of the jury instruction—whether there was sufficient evidence to support the jury's determination that it was objectively reasonable for Officer Carroll to have his weapon drawn when he first approached Defendant's vehicle. Officer Carroll testified that he thought Defendant was "trying to exit the vehicle for whatever reason, and at that time I didn't know. For us that's a safety issue because I don't know whether the driver is trying to exit the vehicle to come approach me, trying to exit the vehicle to run away or what the situation is." As a result, Officer Carroll told the jury, he had his firearm at a "depressed level," which meant it was pointed down and against his thigh. Officer Carroll's testimony regarding the position of his weapon is supported by the dash-cam video of the encounter. Once Defendant opened the door and Officer Carroll could see inside the car, he noted that neither Defendant or the passenger had any visible weapons, and he holstered his firearm. Viewed objectively, and looking to the officer's perspective, the jury could have found that it was not unreasonable for Officer Carroll to have had his weapon drawn and at his side given that it was late at night, Defendant had made two turns off the highway and into a driveway after Officer Carroll initiated the stop, and Officer Carroll saw movement in the car that put him on a "heightened sense of alertness." In any event, a review of the videotape—supported by Officer Carroll's testimony—reveals that the driver's side window was covered with plastic, and it is questionable whether Defendant even knew Officer Carroll had his gun out.

11

**{19}** We further note that the jury was instructed that, in addition to finding Officer Carroll used excessive force, it was also required to find that: (1) Defendant subjectively feared immediate death or great bodily harm; (2) Defendant was in fact put in such fear; and (3) his conduct was reasonable. For at least twelve minutes, from the time Officer Carroll approached the vehicle with his gun drawn until Defendant fled, there is no evidence to suggest that Defendant feared immediate death or great bodily harm or that he was in fact put in such fear. Officer Carroll never pointed his gun at Defendant or threatened him in any way. And our review of the video establishes that Defendant appeared compliant throughout the initial encounter and that he did not exhibit any fear of Officer Carroll. We conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Defendant was not acting in self-defense as a result of Officer Carroll drawing his weapon as he approached the vehicle.

**{20}** We next turn to the question of whether a rational jury could have found that Officer Carroll's use of his taser was an objectively reasonable response to Defendant fleeing. Consistent with our case law, our inquiry into the lawfulness of Officer Carroll's use of his taser looks specifically to his perspective because "officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace." *Ellis*, 2008-NMSC-032, ¶ 23 (alteration, internal quotation marks, and citation omitted).

{21}    Officer Carroll testified that when he first approached the vehicle and before Defendant got out of the car, he asked Defendant for his driver's license. Defendant said he did not have his license but gave the name "Luis Orta." When Officer Carroll ran the name on his computer, he learned that Luis Orta had a revoked license because of a prior DWI and an arrest warrant. Officer Carroll also learned that Defendant had lied about his destination and residence. Officer Carroll decided to place Defendant under arrest for the revoked driver's license and, at that point, Defendant pushed away from him and fled. As he pursued Defendant on foot, Officer Carroll yelled at Defendant several times to stop or he was going to taser him. When he did not stop, Officer Carroll deployed his taser. The deployment failed; however, Officer Carroll continued the foot pursuit.

{22}    The only testimony at trial regarding use of force came from Officer Luis Hernandez, a lieutenant and former instructor at the State Police Academy. He testified that when "[a] person becomes uncooperative and is resisting or moving away, that's where owner use of force policy where the taser is granted to be used." Based on the facts, including that it was dark, and that Defendant was attempting to evade arrest by fleeing, the jury could have found that the deployment of the taser was appropriate in light of the surrounding circumstances. Furthermore, because the deployment of the taser failed, it is questionable whether Defendant even knew that it had been used.

13

{23} Finally, we address whether a rational jury could have found that Officer Carroll used reasonable force when he shot Defendant with his gun and when he attempted to stab Defendant with his knife. Officer Carroll testified that after the deployment of the taser failed, he continued chasing Defendant in the dark. At some point, Defendant either tripped or dropped to the ground, and Officer Carroll got on top of him, screaming at Defendant to "get the fuck on the ground" and calling him a "motherfucker." Suddenly, Defendant turned over and was on top of Officer Carroll. Officer Carroll testified that Defendant started hitting him in the face with what felt like a rock and he could "feel the blood coming down [his] face[.]" According to Officer Carroll, he was terrified and "in a mode of survival," and he repeatedly told Defendant to "just go, Luis, go, go, go Luis, go" and that it was "not worth it to kill a cop for a misdemeanor[.]" The audio recording of the encounter substantiates much of what Officer Carroll testified to in court.

{24} While Defendant was still on top of Officer Carroll, there was a struggle over Officer Carroll's gun. Officer Carroll fired at what he believed was Defendant's center mass. Because it was dark and because of the blood on his face, Officer Carroll thought he did not "hit" Defendant when he pulled the trigger. Moreover, after being shot, Defendant continued to try to wrest Officer Carroll's gun away from him. While they were fighting for control of the gun, Officer Carroll grabbed his utility knife from his left pocket. Officer Carroll testified that, after flipping open the knife, he started

14

making stabbing motions at Defendant in order to get Defendant off him. As we have discussed above, Defendant gained possession of the knife and stabbed Officer Carroll once right below his vest. Defendant then bit Officer Carroll on the right thumb and attempted to strangle him, first with the radio cord and then with his arm.

**{25}** In sum, although the underlying crime was relatively minor, a cracked taillight, it is also clear that Defendant gave Officer Carroll the name of a person who had an arrest clause and that the encounter between Defendant and Officer Carroll quickly escalated into a violent physical altercation. The testimony at trial and the dash-cam video established that Defendant got on top of Officer Carroll almost immediately and began striking him in the face with what felt like a rock, that they struggled over the gun, and that Officer Carroll was terrified and not in control during the struggle. In light of the evidence, we conclude that a reasonable jury could have found that Officer Carroll used necessary force when he fired his gun and when he tried to use his knife to stab Defendant. *See State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862 (noting that the relevant question on appeal is whether any "rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction"). Defendant's convictions for aggravated battery on a peace officer and two counts of disarming a peace officer are affirmed.

**Discovery Violations**

15

**{26}** Lastly, Defendant argues that the district court did not adequately address the State's failure to timely produce discovery, including witness interviews, dash-cam videos, and materials related to taser use. This Court reviews a district court's decision with regard to discovery for an abuse of discretion. *State v. Desnoyers*, 2002-NMSC-031, ¶ 25, 132 N.M. 756, 55 P.3d 968, *abrogated on other grounds as recognized by State v. Forbes*, 2005-NMSC-027, 138 N.M. 264, 119 P.3d 144. "[R]emedies for violation of discovery rules or orders are discretionary with the trial court." *State v. Wilson*, 2001-NMCA-032, ¶ 39, 130 N.M. 319, 24 P.3d 351, *abrogated on other grounds as recognized by State v. Montoya*, 2005-NMCA-078, 137 N.M. 713, 114 P.3d 393. In order to find an abuse of discretion, we must conclude that the decision below was against logic and not justified by reason. *State v. Brown*, 1998-NMSC-037, ¶ 32, 126 N.M. 338, 969 P.2d 313. "Failure to disclose a witness' identity prior to trial in itself is not grounds for reversal. The objecting party must show that he was prejudiced by such non-disclosure." *State v. Griffin*, 1988-NMCA-101, ¶ 11, 108 N.M. 55, 766 P.2d 315 (internal citation omitted). The prejudice must be more than speculative. *See In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

**{27}** In considering whether late disclosure of evidence requires reversal, a reviewing court will consider the following factors: "(1) whether the [s]tate breached some duty or intentionally deprived the defendant of evidence; (2) whether the

improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence." *State v. Mora*, 1997-NMSC-060, ¶ 43, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, 148 N.M. 381, 237 P.3d 683.

**{28}** As we understand Defendant's argument, he is claiming that the State violated the district court's discovery order, Rule 5-501 NMRA, and his constitutional rights by failing to timely name its witnesses and provide the defense with witness interviews and by failing to timely produce evidence including materials related to dash-cam videos and taser use. We begin with the issue of the late disclosed witnesses.

**{29}** Defendant reviews at length the various disclosures and delays by the State, including the disclosure of sixty-two witnesses on six separate witness lists. Prior to trial, Defendant filed a motion to exclude the witnesses that were not disclosed in a timely manner, and the district court subsequently held a lengthy hearing on the motion. We note that the State filed its first witness list naming thirty-six witnesses on August 18, 2011, and also filed a Rule 5-501 certificate of compliance. At the hearing, Defendant conceded that the August 18, 2011 list was filed within the proper time frame and was not at issue. Defendant argued, however, that witnesses on the State's supplemental witness lists filed on October 11, 14, 17, 19, and 26, 2011,

17

should be excluded for violations of Rule 5-501(A)(5) and the district court's order of September 30, 2011.

**{30}** The district court disagreed. During the hearing, the parties informed the court that thirty-four of the witnesses had been interviewed, and the State further explained that most of the witnesses were relevant only to establishing chain of custody. The district court then went painstakingly through each list and inquired about the status of the interviews of each of the State's witnesses, including the anticipated testimony of those who had not yet been interviewed. The State told the court that it would not be calling many of the witnesses, and the district court made notations to that effect on each of the supplemental lists. The district court told defense counsel that defense counsel had "invited some of this" because, although he was entitled to do so, defense counsel was "not willing to work with the other side to eliminate chain of custody people." Importantly, however, by the time the court had gone through the lists, there were only five witnesses left who needed to be interviewed, and the court ordered that they be interviewed by November 4, 2011.

**{31}** We conclude that the district court fashioned an adequate remedy by requiring that the few remaining witnesses be interviewed prior to trial. Defendant does not demonstrate why the remedy was inadequate or how he was prejudiced by the district court's ruling particularly given that most of the witnesses were going to provide cumulative testimony that mostly concerned chain of custody. Moreover, Defendant

18

does not demonstrate with any specificity how earlier disclosure of these witnesses would have affected the outcome of his trial. *See State v. Allison*, 2000-NMSC-027, ¶ 17, 129 N.M. 566, 11 P.3d 141 (noting that evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different). The district court did not abuse its discretion with regard to the arguably late disclosure of witnesses.

{32}     Defendant also contends that his rights were violated because material evidence was not disclosed or was not timely disclosed to him. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that due process requires disclosure of evidence that is both favorable to the accused and "material either to guilt or to punishment." Similarly, the Supreme Court in *United States v. Bagley*, 473 U.S. 667, 678-83 (1985), held that impeachment evidence should be treated like other exculpatory evidence when analyzing the state's disclosure obligation.

{33}     Here, it appears that the State responded to—or Defendant had in his possession—the discovery he was seeking. Indeed, defense counsel acknowledged at the hearing having ultimately received the items it requested, including the CAD reports of Officers Bobnock and Carroll. To the extent Defendant argues that the late disclosure of taser evidence impeded defense counsel's ability to hire an expert witness, we disagree. Defense counsel argued to the district court that they had sent data from Officer Carroll's taser to Taser International for inspection but that Taser

19

International would not have the report ready in time for trial. Moreover, the representative, who asserted that a trained officer could purposely cause a taser malfunction, could not be present at trial. The district court told defense counsel that he could subpoena the representative, who was not being called as an expert, and have her testify by phone. The State had no objection to the telephonic testimony, although, for reasons unknown, the representative ultimately did not testify. We thus conclude that the district court cured any possible issue with the disclosure of the taser data. Although the representative did not testify, we note that Defendant was able to elicit the testimony at trial that the taser was susceptible to tampering from the State's taser instructor.

{34}     Finally, we address Defendant's argument that the district court failed to cure the late disclosure of witnesses by refusing to grant a continuance. The granting or denial of a continuance is within the sound discretion of the trial court, and the burden of establishing abuse of discretion rests with the defendant. *State v. Sanchez*, 1995-NMSC-053, ¶ 17, 120 N.M. 247, 901 P.2d 178. "There are a number of factors that trial courts should consider in evaluating a motion for continuance, including the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the

20

prejudice to the movant in denying the motion." *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20.

{35} Here, defense counsel made his only request for a continuance at the hearing on the motion for discovery sanctions. At the time, he cited his co-counsel's health problems as the basis for the request. The district court denied the continuance because its calendar prevented rescheduling the trial. We cannot say the district court abused its discretion in denying the motion for continuance because co-counsel was present at the subsequent hearing on November 4, 2011, and more importantly, Defendant never renewed his motion again. We are also not persuaded by Defendant's assertion that by failing to grant the continuance, the district court "deprived the defense the opportunity to incorporate these materials into a more effective defense strategy." Defendant does not point to any specific materials nor does he demonstrate how he was prejudiced. Finally, the district court did not err in finding that there was no ineffective assistance of counsel particularly when it assured defense counsel that it would "monitor this closely and it if appears that [there is ineffective assistance of counsel,] I'll declare a mistrial." The district court's discovery rulings and denial of Defendant's motion for continuance did not constitute an abuse of discretion.

**CONCLUSION**

21

{36} For the reasons stated above, we remand to the district court to vacate Defendant's conviction for escape from custody and enter an amended judgment and sentence. We affirm Defendant's remaining convictions.

{37} **IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**J. MILES HANISEE, Judge**